[No. 48726–0.   En Banc.   April 21, 1983.]

KITSAP COUNTY, *Respondent,* v. THE DEPARTMENT OF NATURAL RESOURCES, ET AL, *Appellants,* E. SHIPPEN WILLING, *Respondent.*

Kenneth O. Eikenberry, Attorney General, and Dennis D. Reynolds and Nixon Handy, Assistants, for appellant State.

Rex B. Stratton and David L. Garrison, for appellants Lyle, et al.

C. Danny Clem, Prosecuting Attorney, and Patricia K. Schafer, Deputy, for respondent Kitsap County.

Eglick & Horgan and Peter J. Eglick, for respondent Willing.

Joel M. Gordon on behalf of Washington Environmental Council, amicus curiae for respondent Willing.

DORE, J.—This appeal addresses a challenge by Kitsap County against the issuance of a substantial development permit required by Washington State's Shoreline Management Act of 1971 (SMA), RCW 90.58. The issued permit allowed harvest of subtidal clams by use of a mechanical harvester on several tracts of land located in Agate Passage, Kitsap County. The decision of the Shorelines Hearings

Board (SHB) was appealed to Kitsap County Superior Court, where the County argued that a final environmental impact statement (FEIS) submitted to both the Kitsap County Commissioners and the SHB in compliance with the State Environmental Policy Act of 1971 (SEPA) was inadequate. Upon considering the FEIS and testimony offered by Kitsap County, the court agreed and held that the environmental impact statement (EIS) was inadequate and remanded the case for preparation of a supplemental EIS to remedy such deficiencies. We reverse the trial court, holding that a party may not, for the first time, challenge the adequacy of an EIS on appeal to superior court from an SHB decision.[1]

## I

The Department of Natural Resources (DNR), in coordination with the Department of Fisheries (DOF), leases tracts throughout the state to private entrepreneurs for mechanical harvesting of clams by dredging. The dredge consists of a conveyor belt hooked to a fishing vessel. Water jets at the head of the conveyor belt bore into the substrate approximately 20 inches. The loosened material falls into a cutting blade and is then carried up the conveyor belt, which is fitted with a 1–inch–square mesh. Finer materials fall through the belt, and materials other than marketable–size clams are thrown overboard. The dredge operator must obtain a clam farm license from DOF and a clam harvest permit from DNR which approves his specific dredge. The operator then leases tracts from DNR, the 5–year leases being renewable contingent upon the continued abundance of clams.

In 1972, DNR leased tracts within Agate Passage to defendant Francklyn. The tracts extend, at extreme low tide, from minus 4.5 feet to the depth the dredge can reach, approximately 50 feet. The tracts are located within a resi-

---

[1]As we conclude Kitsap County was barred from raising the environmental impact statement adequacy issue at the superior court level, we do not reach the adequacy issue presented by the County and considered by the lower court.

dential area, designated semirural by the Kitsap County Shoreline Master Program (Master Program). Clam harvesting occurred in Agate Passage for 6 years from 1972 until 1978 without regulation or protest from Kitsap County.

In 1977, this court ruled in *English Bay Enters., Ltd. v. Island Cy.*, 89 Wn.2d 16, 568 P.2d 783 (1977) that subtidal mechanical clam harvesting was an "activity" within the meaning of the SMA. At Kitsap County's request, DNR filed an application for a substantial development permit pursuant to the SMA to continue the dredging activities. The Board of County Commissioners denied DNR's application, finding the proposed activity to be inconsistent with the County's 1977 Master Program as well as the intent and policies of the SMA. At that time, no one objected to the adequacy of the EIS filed by the state agencies in compliance with SEPA, and the Commissioners did not address the adequacy of the document in their findings.

The lessee filed a request for review by the SHB in October 1978. The SHB found the County's 1977 Master Program did not apply, and remanded to the County for an additional hearing. On remand, the County again denied the substantial development permit request, once more not addressing itself to the adequacy of the EIS in its findings. The SHB did, however, make specific findings that the applicants had not presented alternatives to the hydraulic mechanical clam harvester; that the noise generated by the dredge had a profound impact on property owners; and that new information indicated the tracts might contain a spawning area for bottom fish.

DNR then filed a supplemental request for review with the SHB. Pursuant to SHB regulations, the parties filed written statements of issues to be decided by the SHB, which "control the subsequent course of the proceedings". WAC 461-08-140. Kitsap County did not list as an issue of law or fact the inadequacy of the submitted EIS.

Upon hearing DNR's appeal de novo in April 1980, the SHB reversed the County Commissioners and remanded to

the County directing issuance of a substantial development permit containing certain conditions. The SHB findings specified that noise level and impact of lingcod spawning presented no environmental basis for denying the requested permit.[2] On appeal to the Kitsap County Superior Court, the court heard testimony of witnesses concerning what should appear in an EIS, then ruled that the EIS was inadequate as a matter of law. In addressing the adequacy of the EIS, the lower court did not consider the testimony presented to the SHB, stating that to do so would

> seriously impair the intent of SEPA to have the FEIS be the vehicle by which all decision makers at whatever stage have the opportunity to review all impacts, and based upon those to make their decision. Also it would deprive other interested parties from having complete information available unless they attended the SHB hearings. . . . [I]t would mean that Kitsap County would be deprived of any objective means to evaluate any noise level from the standpoint of the nuisance aspect, and furthermore would not have had an opportunity to review any impact on the lingcod population and spawn-

---

[2]Finding of fact 5 (Clerk's Papers, at 36–37) provides:

"Areas within the tracts have been identified by Department of Fisheries (DOF) as potential ling cod spawning areas. Because of this, DOF will not allow mechanical clam harvesting there until it carries out further studies to determine if, in fact, any damage to ling cod could occur. These areas are approximated by the cross–hatching on exhibit R–20.

"The results of the studies just described should be presented to both Kitsap County and the Department of Ecology."

Finding of fact 7 (Clerk's Papers, at 37–38) provides:

"The normal background noise level in Agate Pass varies from 42–50 dBA. With the operation of the mechanical clam harvester in the past, this level has reached 60 dBA. The harvester has operated throughout the day and night in the past. This noise has unreasonably interfered with enjoyment of life and property by persons residing on the shores of Agate Pass. Noise from the harvester primarily emanates from its two diesel engines. Although action has been taken to reduce this noise, further reduction is practical. Limitations on both peak and duration of noise are necessary to prevent unreasonable interference.

"The mechanical clam harvester should result in peak noise level, in the receiving area on the shores of Agate Pass, of no more than 55 dBA. The mechanical clam harvester should not operate except between the hours of 7:00 a.m. and 10:00 p.m. Monday through Friday. These hours of operation were stipulated by appellants on the record at hearing."

ing grounds. . . . The FEIS must be evaluated as it was prepared and considered by all persons reviewing the same.

Memorandum Opinion of March 24, 1981. Clerk's Papers, at 71–72.

## II

The SEPA guidelines[3] establish the process by which the lead agency preparing an EIS seeks information from other public agencies prior to finalizing the EIS. WAC 197–10–160; WAC 197–10–500 through –545. Local agencies are required to submit information and comment if requested by the lead agency. WAC 197–10–500. WAC 197–10–545 provides in part:

> Any consulted agency which fails to submit substantive information to the lead agency in response to a draft EIS is thereafter barred from alleging any defects in the lead agency's compliance with WAC 197–10–400 through 197–10–495, or with the contents of the final EIS.

SEPA defines "consulted agency" as "any agency with jurisdiction or with expertise which is requested by the lead agency to provide information during a threshold determination or predraft consultation or which receives a draft environmental impact statement". WAC 197–10–040(7). An "agency with jurisdiction" includes an agency from which a nonexempt license (such as the substantial development permit here) is required for a proposal or any part thereof.

The SEPA guidelines were structured in such a way as to require consulted agencies to participate in the SEPA process at a time when their participation is meaningful and contributes to the environmental assessment at the earliest possible opportunity. Where the objection to an EIS is saved until the parties receive an unfavorable decision, the purposes of SEPA are frustrated.

In the present case, appellants Departments of Natural

---

[3]In compliance with the State Environmental Policy Act of 1971 (SEPA), the Council on Environmental Policy adopted the SEPA guidelines on January 16, 1976, in WAC 197–10, as later revised by the Department of Ecology effective January 21, 1978.

Resources and Fisheries were the lead agencies for the EIS prepared on the State's clam harvesting program. WAC 197–10–040(19). The appellants sent a copy of the draft EIS to respondent Kitsap County for review and comment, but the County did not bother to comment or provide information on the EIS draft. The County is, therefore, now barred from alleging any defect in the adequacy of the EIS.

■ The County is also barred from raising the adequacy of the appellants' EIS as a new issue in superior court by the administrative procedure act (RCW 34.04). The Legislature has established, in the SMA, particular appeal procedures. RCW 90.58.180. These procedures are different from a typical zoning or land use case involving SEPA, where the party challenging the governmental action seeks superior court review by petition or writ of certiorari. *See, e.g., Leschi Imp. Coun. v. State Hwy. Comm'n,* 84 Wn.2d 271, 525 P.2d 774 (1974). There, the superior court conducts a de novo review of the governmental agency's action, including SEPA issues. Any party may raise any issue before the court in a full trial in these cases. Under the SMA, however, parties apply for substantial development permits directly from the affected local government. Parties may not appeal from the local government determination directly to superior court. Instead, aggrieved parties are mandated to appeal these determinations to the SHB for a contested case proceeding under the administrative procedure act. RCW 90.58.180.

### III

The SMA established the SHB as a quasi–judicial administrative body with specialized skills in hearing shoreline cases. The SHB conducts its hearings as contested cases under the administrative procedure act. RCW 90.58-.180(3). The SHB hearing is a de novo review of the local governmental determination. WAC 461–08–174. In effect, the Legislature has substituted SHB review of local government determinations under the SMA for direct superior

court review by writ of certiorari. Superior court review of SHB decisions under the SMA, however, is limited to the record created by the parties before the SHB. RCW 34.04-.130. Judicial review of a contested case by a county superior court is not de novo.

An issue not raised in a contested case proceeding may not be raised for the first time upon superior court review of the record. *Griffin v. Department of Social & Health Servs.*, 91 Wn.2d 616, 590 P.2d 816 (1979); *Peninsula Tel. & Tel. Co. v. State Utils. & Transp. Comm'n*, 89 Wn.2d 795, 575 P.2d 1066 (1978); *Leschi Imp. Coun. v. State Hwy. Comm'n*, 84 Wn.2d 271, 525 P.2d 774 (1974); *Freedman v. Department of Social & Health Servs.*, 12 Wn. App. 598, 530 P.2d 1344 (1975). The principle is stated in *Griffin*, at page 631:

> Our review of the record indicates that appellants did not raise this issue before either the hearing examiner or the trial court. Failure to raise issues during the course of an administrative hearing precludes the consideration of such issues on review. *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 525 P.2d 774 (1974).

## CONCLUSION

A review of the record demonstrates that the adequacy of the final environmental impact statement was not questioned before the Kitsap County Commissioners or the Shorelines Hearings Board, and could not, therefore, be considered for the first time by the Kitsap County Superior Court.

We reverse the trial court and hold that Kitsap County is barred from raising the environmental impact statement inadequacy issue at the superior court level.

WILLIAMS, C.J., STAFFORD, UTTER, BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

Reconsideration pending October 20, 1983.