[No. 59249-7. En Banc. November 4, 1993.]

KING COUNTY, *Respondent*, v. WASHINGTON STATE BOUNDARY REVIEW BOARD FOR KING COUNTY, ET AL, *Appellants*.

*Christine O. Gregoire, Attorney General,* and *Robert C. Kaufman, Special Assistant,* for appellant Boundary Review Board.

*Preston Thorgrimson Shidler Gates & Ellis,* by *Fredric C. Tausend* and *Eric S. Laschever; Michael Reynolds, City Attorney,* for appellants Black Diamond Associates, et al.

*Cairncross & Hempelmann, P.S.,* by *John W. Hempelmann* and *Alan L. Wallace,* for appellant Plum Creek Timber Co.

*Norm Maleng, Prosecuting Attorney, Charles E. Maduell, Senior Deputy,* and *H. Kevin Wright, Deputy,* for respondent.

UTTER, J. — This complex case involves the interaction and application of three of our major land use regulatory statutes: the growth management act, RCW 36.70A (GMA), the boundary review board act, RCW 36.93 (BRB Act), and the State Environmental Policy Act of 1971, RCW 43.21C (SEPA). Specifically at issue is the approval by the Bound-

ary Review Board for King County (Board) of two proposed annexations by the City of Black Diamond (Black Diamond). Sitting in an appellate capacity, the Superior Court for King County reversed the Board's approval of the annexations, holding that the Board's decision was not supported by substantial evidence and was affected by error of law for failure to adequately consider the effect of the GMA. The Superior Court also held SEPA had been violated. Black Diamond, the Board, and various landowners (collectively "appellants") appealed.

We affirm the Superior Court's ruling with respect to compliance with SEPA and remand for the preparation of an environmental impact statement by Black Diamond as the lead agency for the proposed annexations. However, we reverse with respect to whether the Board's decision was supported by substantial evidence or affected by error of law. Consequently, the Board will not be required on remand to conduct its review procedure again in full; instead, it will be sufficient for the Board to conduct hearings and take evidence on the relevance, if any, of the environmental impact statement.

## I
## A

In April of 1990, the Legislature embarked upon an ambitious new land management initiative by enacting the growth management act. *See generally* Laws of 1990, 1st Ex. Sess., ch. 17 (codified, as amended, at RCW 36.70A). The goal of the GMA was to promote "comprehensive land use planning" through cooperation between "citizens, communities, local governments, and the private sector". Laws of 1990, 1st Ex. Sess., ch. 17, § 1 (codified at RCW 36.70A.010).

One key element of the GMA is the designation of what are called "urban growth areas". Once established, these areas will serve as focal points for future urban development, thereby providing a rational framework for growth. Through this framework, the GMA seeks to reduce urban sprawl and other urban development problems. *See* Laws of

1990, 1st Ex. Sess., ch. 17, § 2 (codified at RCW 36.70A.020). Section 11 of the GMA requires certain counties, in cooperation with local cities and towns, to designate urban growth areas. Laws of 1990, 1st Ex. Sess., ch. 17, § 11 (codified at RCW 36.70A.110).

The process by which counties are to designate urban growth areas is carefully specified. Existing city and town boundaries are employed as the starting points for urban growth, and all lands within those boundaries are automatically designated as part of an urban growth area. Laws of 1990, 1st Ex. Sess., ch. 17, § 11(1) (codified at RCW 36.70A-.110(1)). Additional unincorporated land is then added to the urban growth areas such that the areas are "sufficient to permit the urban growth that is projected to occur in the county for the succeeding twenty-year period."[1] Laws of 1990, 1st Ex. Sess., ch. 17, § 11(2) (codified at RCW 36.70A-.110(2)). In order to assist counties in ascertaining the facts necessary to perform the second half of the designation process, cities and towns are to provide county planners with proposals regarding the additional areas necessary to permit the projected 20-year growth. Laws of 1990, 1st Ex. Sess., ch. 17, § 11(2) (codified at RCW 36.70A.110(2)). Conflicts between counties and local municipalities over the designation of urban growth areas may ultimately be resolved by the Department of Community Development. Laws of 1990, 1st Ex. Sess., ch. 17, § 11(2) (codified at RCW 36.70A.110(2)).

Once the urban growth areas have been designated for a particular county, a number of substantive restrictions are imposed upon growth in that county. For example, development regulations implementing the limitation of urban growth to urban growth areas must be developed within 1 year. Former RCW 36.70A.120. Most relevant to this case, cities and towns within a county with designated urban

---

[1] The statute also mandates that "[u]rban growth should be located first in areas already characterized by urban growth . . .." Laws of 1990, 1st Ex. Sess., ch. 17, § 11(3). The designation process therefore exhibits a preference for urban growth areas where urban development, even if unincorporated, already exists.

growth areas are *prohibited* from annexing territory outside of an urban growth area. Laws of 1990, 1st Ex. Sess., ch. 17, §§ 30, 31 (codified at RCW 35.13.005, RCW 35A.14.005).

King County is one of the counties required by the GMA to designate urban growth areas and has developed a number of policies and a schedule for accomplishing the designation within the statutory timeframe. Clerk's Papers, at 464, 465-68. In addition, King County and its 31 incorporated municipalities have agreed to a joint regional strategy for identifying and designating urban growth areas. Clerk's Papers, at 470-73.

**B**

On February 12, 1991, prior to the designation of the urban growth areas in King County, Black Diamond filed notices of intent with the Board for approval to annex certain properties southwest of its city limits. According to Black Diamond, its interest in annexing the properties in question was in protecting the Rock Creek Drainage Basin, the watershed in which Black Diamond is located. The City was apparently concerned that septic tank development under county jurisdiction could jeopardize the Rock Creek Basin and wished to ensure that any development would be attached to the Black Diamond sewer system.

Black Diamond had historical reason for its concern, since the City has had a particularly checkered record in regard to the disposal of municipal waste. Black Diamond's mayor, Howard Botts, described the City's experience with such waste as an "environmental, administrative, and economic nightmare". Testimony of Mayor Howard Botts before the Board; Clerk's Papers, at 136.

Black Diamond experienced a failure of its septic system drain fields in the late 1970's. When the drain fields failed, Rock Creek became contaminated and ultimately so did Lake Sawyer, the body of water into which Rock Créek runs. With the help of the United States Environmental Protection Agency, Black Diamond responded to the septic failure by constructing a new waste water treatment facility, which

included dispersion of effluent into a 132-acre marsh. While the new treatment facility solved the septic problem, it created new problems in Lake Sawyer because the effluent marsh failed to absorb the nutrients contained in the treated waste water. As a result, Lake Sawyer began to erupt in periodic algae blooms. To solve this new problem, Black Diamond constructed a sewer line to the Metro waste disposal system, also with the assistance of the United States Environmental Protection Agency.

The two annexations proposed by Black Diamond include largely uninhabited property within the Rock Creek Drainage Basin, southwest of the existing city borders. The first proposed annexation includes the properties of a number of landowners who are now appellants before this court. These include: Plum Creek Timber Company, L.P. (Plum Creek), James and Charlene Birklid, Palmer Coking Coal Company (Palmer Coking), and Black Diamond Associates.[2] The second annexation proposal consists of a quarter section of land owned entirely by Palmer Coking.

The day after filing its notices of intent with the Board, Black Diamond, acting in its capacity as lead agency for the proposed annexations, issued a determination of nonsignificance (DNS) for purposes of compliance with SEPA. Clerk's Papers, at 1438, 1453.[3] The DNS was based primarily on certain environmental checklists prepared by Black Diamond Associates and Palmer Coking for the City. See environmental checklists; Clerk's Papers, at 1440, 1456. These checklists indicate there is no existing proposal to develop the annexation properties. Palmer Coking's checklist, however, indicates the preferred use of its property is "Single family residential", and an alternative use is "Residential/Golf Course Community". Clerk's Papers, at 1456. Black Diamond

---

[2]The first proposed annexation also includes a roadway extension from the Plum Creek property northward to the Auburn-Black Diamond Road.

[3]Black Diamond actually issued two determinations of nonsignificance, one for each of the proposed annexations. For simplicity's sake, this opinion treats these two documents as a single DNS.

Associates' checklist noted an intent to evaluate the possibility of a "golf course related development" or gravel excavation. Clerk's Papers, at 1440. The record does not reveal that any of the other property owners submitted an environmental checklist to Black Diamond.

King County appealed the DNS to the Black Diamond City Council, but the appeal was denied.

## C

On March 22, 1991, while the DNS appeal was pending, the King County Council enacted ordinance 9849, entitled "An Ordinance designating urban growth areas on an interim basis for purposes of implementing SHB 2929, the Growth Management Act, on an emergency basis . . .". King County Ordinance 9849 (Ordinance 9849). King County was concerned that continuing annexations would undermine the process for designating urban growth areas under the GMA and passed the ordinance in the hope of preserving the status quo pending designation of the permanent urban growth areas. Ordinance 9849. According to its terms, the ordinance was scheduled to expire on August 22, 1991. Ordinance 9849.

Also while the DNS appeal was pending before the Black Diamond City Council, King County filed a request for Board review of the proposed annexations. Pursuant to this request, the Board held two full public hearings, on July 22 and July 29, 1991. At these hearings, the Board received numerous exhibits and heard extensive testimony, including testimony by each of the parties and by concerned local citizens.

On August 23, the Board issued its resolution and hearing decision, approving the first annexation with minor modifications and the second annexation as proposed. In reaching its decision, the Board considered a number of the "factors" enumerated in RCW 36.93.170 and each of the "objectives" listed in RCW 36.93.180. See resolution and hearing decision (Board's decision); Clerk's Papers, at 1218-29. The Board did not conduct its own environmental investigation of compli-

ance with SEPA, nor did it issue a DNS or an environmental impact statement.

King County appealed the Board's decision to the Superior Court for King County. In its appeal, King County argued the decision of the Board should be reversed because it was both unsupported by substantial evidence and affected by error of law for failure to consider the effect of the GMA. King County also argued the decision should be overturned because the DNS issued by Black Diamond was improper.

On April 9, 1992, over a year after the original filing of the notices of intent, the Superior Court issued a decision reversing the Board's decision on each of the grounds suggested by King County. The court concluded "that there was not substantial evidence in the record to support the Board's findings that these annexations would in any substantial way achieve the objectives of RCW 36.93.180" and "that the Board's decision was willful and unreasoning." Superior court decision; Clerk's Papers, at 1583. The court also concluded the Board's decision was "contrary to law" because the annexations were precluded by Ordinance 9849. Superior court decision; Clerk's Papers, at 1585. As an alternative holding, the Superior Court determined the Board's decision would have to be remanded in any event since Black Diamond's issuance of the DNS was "clearly erroneous". Superior court decision; Clerk's Papers, at 1587.

We granted direct review on December 1, 1992.

## II

The first issue in this case concerns compliance with the provisions of SEPA, particularly with respect to the DNS issued by Black Diamond in its capacity as lead agency for the proposed annexations. King County argues the DNS was "clearly erroneous" and should be reversed. Appellants contend the DNS was proper because consideration of the environmental effects of future development of the annexation properties would be premature and speculative.

■ SEPA requires the preparation of an environmental impact statement (EIS) for any "major action[] significantly

affecting the quality of the environment." RCW 43.21C.030. The basic purpose of this command is "to require local governments to consider total environmental and ecological factors to the fullest extent when taking 'major actions significantly affecting the quality of the environment.'" *Lassila v. Wenatchee*, 89 Wn.2d 804, 813, 576 P.2d 54 (1978) (quoting RCW 43.21C.030); *Sisley v. San Juan Cy.*, 89 Wn.2d 78, 82, 569 P.2d 712 (1977).[4] The provisions of SEPA apply to decisions by boundary review boards. *Bellevue v. King Cy. Boundary Review Bd.*, 90 Wn.2d 856, 865-66, 586 P.2d 470 (1978).

Not every governmental action requires the preparation of an EIS. *Lassila*, 89 Wn.2d at 813. Instead, SEPA only requires that "[a]n environmental impact statement . . . shall be prepared on proposals for legislation and other major actions having a probable significant, adverse environmental impact." RCW 43.21C.031. If an agency determines an action will not have a significant adverse effect upon the environment, it issues a determination of nonsignificance, or DNS. WAC 197-11-340.

### A

As a threshold issue, appellants argue King County is procedurally barred from challenging Black Diamond's DNS at this stage for failure to properly appeal the DNS before the Superior Court. With respect to judicial review of environmental determinations, SEPA provides:

> Judicial review under this chapter shall without exception be of the governmental action together with its accompanying environmental determinations.

RCW 43.21C.075(6)(c). This provision requires that any appeal of an environmental determination must be made in conjunction with an appeal of the underlying governmental action. Appellants contend King County failed to comply

---

[4]While SEPA is primarily procedural, this court has also permitted agencies to make substantive decisions on the basis of environmental information adduced during the SEPA process. *See Polygon Corp. v. Seattle*, 90 Wn.2d 59, 65-66, 578 P.2d 1309 (1978).

with this provision since the DNS was not specifically included within the notice of appeal to the Superior Court.[5]

■■ However, King County's notice of appeal contained a general claim that the Board had failed to comply with SEPA. See Notice of Appeal; Clerk's Papers, at 6. In addition, the validity of the DNS was fully briefed, argued, and decided by the lower court. See Clerk's Papers, at 1086-94, 1201-14, 1365-70, 1585-87. Where parties brief and argue an issue in a lower court, and the court rules upon it, that issue is properly raised for appellate review even if not formally within the pleadings before the lower court. *See, e.g., Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 768, 733 P.2d 530 (1987); *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 347, 831 P.2d 724 (1992). The purpose of a notice of appeal, like the purpose of pleadings generally, is to put the court and opposing parties on notice that an issue is being raised. *See Reichelt*, 107 Wn.2d at 768. That purpose was served here by the fact that the validity of the DNS was briefed and argued before the Superior Court. Moreover, the lead agency responsible for the DNS, Black Diamond, was a party to the proceedings before the Superior Court.

■ Appellants have expressed concern that the record of the Black Diamond DNS proceedings was not before the Superior Court for review. An examination of the superior court record, however, reveals that the DNS and the documents on which it was based, the environmental checklists, were in fact before the lower court. See Clerk's Papers, at 1438-68. The appellants allege that the minutes of the city council's DNS appeal hearing were not before the lower court. However, they have cited no rule or statute in support

---

[5]It is worth noting that appellants do *not* contend that RCW 43.21C.075(6)(c) completely bars King County from challenging the DNS during an appeal of the Board's decision. It should be clear that RCW 43.21C.075(6)(c) does not prohibit a SEPA appeal during a substantive appeal of agency action simply because the environmental determination was made by another agency acting as lead agency. Under such circumstances, the lead agency's environmental determinations fall within the category of "accompanying environmental determinations" which may be appealed at the same time as the substantive governmental action.

of the proposition that those minutes were necessary for superior court review of the DNS.[6] The DNS is therefore properly before this court for review.[7]

## B

Having determined that the DNS is appropriately before us, we turn now to the standards governing judicial review and application of those standards to Black Diamond's DNS.

█ Threshold determinations that an EIS is not required are subject to judicial review under the "clearly erroneous" standard. *Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun.*, 87 Wn.2d 267, 273-76, 552 P.2d 674 (1976); *Sisley v. San Juan Cy.*, 89 Wn.2d 78, 85, 569 P.2d 712 (1977); *Pease Hill Comm'ty Group v. County of Spokane*, 62 Wn. App. 800, 810, 816 P.2d 37 (1991). Under this standard, a reviewing court will overturn an agency's DNS when:

> [A]lthough there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Norway Hill*, 87 Wn.2d at 274 (quoting *Ancheta v. Daly*, 77 Wn.2d 255, 259, 461 P.2d 531 (1969) (quoting *United States*

---

[6]While RCW 43.21C.075(3), which establishes parameters for those agencies possessing procedures for SEPA appeals, could conceivably be read to impose such a requirement, appellants have not cited those procedures, described their content, or argued how this provision might relate to judicial review of a DNS. Given the absence of briefing or argument on this point, we decline to rest our holding on it. *See In re F.D. Processing, Inc.*, 119 Wn.2d 452, 456, 832 P.2d 1303 (1992) (citing *John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 785, 819 P.2d 370 (1991)).

[7]Appellants have argued that, under the lead agency provisions of the administrative regulations implementing SEPA, the "SEPA Rules", the Board was *bound* to accept the Black Diamond DNS as valid. *See* WAC 197-11-600. Because we are directly reviewing the DNS in this case, it is unnecessary for us to address this argument. We do note, however, that the SEPA Rules allow an agency which is "dissatisfied" with a lead agency's DNS to assume lead agency status and make its own threshold determination. WAC 197-11-600(3)(a); WAC 197-11-948. Under the SEPA Rules, therefore, nonlead agencies are not constrained to accept a lead agency DNS but instead may make an independent determination as to whether they are "dissatisfied" with the lead agency's decision. Boundary review boards and other agencies subject to SEPA requirements should use this authority to ensure proper compliance with SEPA.

*v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948))). *Accord, Cougar Mt. Assocs. v. King Cy.*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988); *Pease Hill*, 62 Wn. App. at 810.

The DNS issue in this case turns largely on the extent to which Black Diamond should have evaluated the effects of potential development of the proposed annexations. Appellants argue that any future development of the property is speculative and thus is not suitable for full environmental review. Particular reliance is placed upon the contention that no official proposals have been submitted to Black Diamond for the development of the annexation properties. For this reason, appellants believe there is no "probable significant, adverse environmental impact" of the sort necessary to trigger the preparation of an EIS.

Our case law is divided on the appropriate analysis to be applied to impacts arising from possible future development in assessing the need for an EIS. A number of SEPA cases have applied a categorical approach focusing only on whether a proposed action will directly effect a change in land use. *See, e.g., Lassila v. Wenatchee*, 89 Wn.2d 804, 815, 576 P.2d 54 (1978); *Carpenter v. Island Cy.*, 89 Wn.2d 881, 884-85, 577 P.2d 575 (1978); *see also Bellevue v. King Cy. Boundary Review Bd.*, 90 Wn.2d 856, 870-71, 586 P.2d 470 (1978) (Hamilton, J., dissenting). Unless a change in land use will directly or causally result from the proposed action, an EIS is not required. Employing this approach, the court has not required an EIS for the acquisition and sale of property, *Lassila*, 89 Wn.2d at 815, and the annexation of territory to a sewer district, *Carpenter*, 89 Wn.2d at 885. Appellants rely heavily on this line of cases, noting that the annexations here are not associated with any direct and immediate change in land use.

A second line of SEPA cases has engaged in a broader analysis of the probability that land use changes will follow the proposed action, even if development is not the direct and immediate result of the government action. *See Bellevue*, 90 Wn.2d at 868; *Murden Cove Preserv. Ass'n v. Kitsap*

*Cy.*, 41 Wn. App. 515, 525-27, 704 P.2d 1242 (1985); *Juanita Bay Vly. Comm'ty Ass'n v. Kirkland*, 9 Wn. App. 59, 72, 510 P.2d 1140, *review denied*, 83 Wn.2d 1002 (1973); *see also Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 344, 552 P.2d 184 (1976) (applying a similar approach to reviewing the appropriate scope of an EIS). Under these cases, the fact that a proposed action will not cause an immediate land use change or that there is no specific proposal for development does not vitiate the need for an EIS. Instead, an EIS is required if, based on the totality of the circumstances, future development is probable following the action and if that development will have a significant adverse effect upon the environment. Applying this analysis, courts have required an environmental assessment for proposed annexations to cities, *Bellevue*, reversed a decision not to prepare an EIS for grading land which could lead to an industrial park development, *Juanita Bay*, and allowed a rezone without an EIS, *Murden Cove.*[8]

This latter, more fact-sensitive approach, represented by the *Bellevue* decision, is more consistent with the language and purposes of SEPA than is the categorical approach. RCW 43.21C.031 mandates that an EIS should be prepared when significant adverse impacts on the environment are "probable", not when they are "inevitable". The absence of specific development plans should not be conclusive of whether an adverse environmental impact is likely.

The categorical approach can lead to results contrary to the purposes of SEPA. One of SEPA's purposes is to provide consideration of environmental factors at the earliest possible stage to allow decisions to be based on complete disclosure of environmental consequences. *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 118, 508 P.2d 166 (1973); *Loveless v. Yantis*, 82 Wn.2d 754, 765-66, 513 P.2d

---

[8]The split in the case law has been noted in the commentary. *See, e.g.*, Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* 103 (1987 & Supp. 1992) (noting dichotomy between general trend in case law and decisions like *Carpenter*).

1023 (1973). Decisionmaking based on complete disclosure would be thwarted if full environmental review could be evaded simply because no land use changes would occur as a direct result of a proposed government action. Even a boundary change, like the one in this case, may begin a process of government action which can "snowball" and acquire virtually unstoppable administrative inertia. *See* Rodgers, *The Washington Environmental Policy Act*, 60 Wash. L. Rev. 33, 54 (1984) (the risk of postponing environmental review is "a dangerous incrementalism where the obligation to decide is postponed successively while project momentum builds").[9] Even if adverse environmental effects are discovered later, the inertia generated by the initial government decisions (made without environmental impact statements) may carry the project forward regardless. When government decisions may have such snowballing effect, decisionmakers need to be apprised of the environmental consequences *before* the project picks up momentum, not after.

We therefore hold that a proposed land use related action is not insulated from full environmental review simply because there are no existing specific proposals to develop the land in question or because there are no immediate land use changes which will flow from the proposed action. Instead, an EIS should be prepared where the responsible agency determines that significant adverse environmental impacts are probable following the government action.[10]

## C

In applying the above rule to Black Diamond's decision to issue the DNS, this court must reverse if it is left with the

---

[9]*Cf.* Settle, *supra* at 103 (statement may be required where action "would induce expectations of environmentally significant development which future decision makers may be reluctant to disappoint").

[10]Even where an EIS is required, a lead agency may still employ the "nonproject proposal" provisions of the SEPA Rules. Under these provisions, agencies can limit the scope of an EIS to "the level of detail appropriate to the scope of the nonproject proposal". WAC 197-11-442(2). Uncertainties in development plans can thereby be dealt with by the lead agency without violating the mandate of SEPA.

"definite and firm conviction that a mistake has been committed." *Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun.*, 87 Wn.2d 267, 274, 552 P.2d 674 (1976); *Cougar Mt. Assocs. v. King Cy.*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988).

The likelihood of development of the annexation properties is unquestionable. On even a cursory reading of the record, it is clear that the annexation properties are destined for development. Black Diamond has itself recognized this fact. In hearing King County's original appeal of the DNS, the Black Diamond City Council made a finding of fact that the areas in question will be designated "medium density residential" following annexation.

Most importantly, the environmental checklists submitted by Black Diamond Associates and Palmer Coking indicate an intent to develop the annexation properties. See, *e.g.*, Black Diamond Associates' checklist; Clerk's Papers, at 1450-51. The Palmer Coking checklist, for example, describes the proposed land use for the properties as "Single family residential", with an alternative use described as "Residential/Golf Course Community". Palmer Coking's Checklist; Clerk's Papers, at 1456. Either of these alternatives would involve significant development. It is therefore clear there was substantially more than a mere possibility that the land in question would be developed following annexation; indeed, it was a virtual certainty. Given the provisions in the GMA for the inclusion of all incorporated territory in urban growth areas, this conclusion is not surprising. As discussed above, if these properties are annexed, they will by force of law become part of the Black Diamond urban growth area.

There is also no doubt the development discussed in the environmental checklists will have a significant adverse impact on the environment. Such development would have a major impact on water drainage and quality, environmentally sensitive wetlands and wildlife habitat, open spaces, and the adjacent rural communities. Appellants do not contest that development would have such effects and, on the record in this case, the potential adverse effect of this development may be presumed. *See Bellevue v. King Cy. Boundary*

*Review Bd.*, 90 Wn.2d 856, 868, 586 P.2d 470 (1978). The proposals thus will result in significant adverse effects on the environment arising from the probable development of the annexation properties.[11] Under the rule enunciated above, therefore, an EIS should have been prepared for the proposed annexations.

We note that the SEPA issue in this case is hardly a makeweight. Despite appellants' vigorous contentions to the contrary, full environmental review can serve a number of useful functions within the context of this case. First, as the Palmer Coking checklist indicates, there are already at least two alternative plans for development of part of the annexation property. The presence of these two alternatives indicates that future development plans are *not* entirely speculative. These alternatives may be usefully employed as the basis for an EIS.

Second, an EIS could assist the Board in crafting the appropriate scope of annexation approvals. Plum Creek contends an EIS may be difficult to prepare because there are no guaranties as to what annexations could be approved by the Board. The BRB Act provides authority for the Board to modify annexation proposals before granting approval. RCW 36.93.150(2). This argument proves too much, however, since one important function of an EIS would be to identify alternative annexation possibilities so as to assist the Board in making its decision. The point of an EIS is not to evaluate agency decisions after they are made, but rather to provide environmental information to assist with *making* those decisions. *Norway Hill*, 87 Wn.2d at 279; *Sisley v. San Juan Cy.*, 89 Wn.2d 78, 86-87, 569 P.2d 712 (1977).

Third, Black Diamond's oft-stated goal in proposing these annexations was itself environmental. As Mayor Botts made

---

[11]Appellants make much of the possibility that some development of the annexation properties could also take place under county jurisdiction. The specter of adverse environmental effects in the *absence* of government action, however, is itself not a justification for evading full environmental review. *See* WAC 197-11-330(5) ("A threshold determination shall not balance whether the beneficial aspects of a proposal outweigh its adverse impacts").

clear before the Board, Black Diamond wishes to annex these properties because it fears development of the properties on septic tanks. Testimony of Mayor Botts before the Board; Clerk's Papers, at 135-36. Black Diamond has concluded that its sewer system will be environmentally superior to a septic system, but has done so without a full environmental review of the question. It seems entirely possible that development under Black Diamond's jurisdiction, even on a sewer system, could actually worsen the environmental situation by increasing pressure on sewer capacity or even by facilitating denser development than available under county jurisdiction on septic. At the very least, an EIS could assist in the consideration of that question.

For these reasons, we are left with the "definite and firm conviction" that a mistake has been made, and that an EIS should have been prepared regarding the proposed annexations. The DNS is therefore reversed.

## D

■ In cases involving reversal of a DNS, it is necessary to remand to the agency for preparation of an EIS and enjoin the agency action until the statement is complete. *Bellevue v. King Cy. Boundary Review Bd.*, 90 Wn.2d 856, 869, 586 P.2d 470 (1978); *Lassila v. Wenatchee*, 89 Wn.2d 804, 818, 576 P.2d 54 (1978); *Sisley*, 89 Wn.2d at 90; *Gardner v. Pierce Cy. Bd. of Comm'rs*, 27 Wn. App. 241, 617 P.2d 743 (1980). We therefore reverse Black Diamond's DNS, enjoin the proposed annexations, and remand for further proceedings, including preparation of an EIS. Because the Board's decision to approve the proposed annexations was based on the City's DNS, we must also reverse the Board.

Although this holding disposes of the case, considerations of administrative economy mandate that we review the other claims brought by King County against the Board's decision. If Black Diamond elects to continue the annexation process following the preparation of an EIS, the Board will be required to address these annexation proposals again. To prevent a waste of administrative resources, we address the

other issues in this case in order to clarify the Board's responsibilities on remand.

### III

The central non-SEPA issue with respect to the Board's decision to approve the annexations is the relationship of Ordinance 9849 to the GMA. According to King County, Ordinance 9849 establishes "interim urban growth areas" pending designation of King County's permanent urban growth areas and thus prohibits annexations of the sort proposed by appellants. Appellants challenge the validity of Ordinance 9849, asserting that the detailed planning provisions of the GMA were intended by the Legislature to be the exclusive means of establishing urban growth areas and therefore preempt attempts by counties to establish "interim" areas. In considering these arguments, the Superior Court concluded the Board's decision to approve the annexations in the face of Ordinance 9849 was an error of law. Superior court decision; Clerk's Papers, at 1583.

The validity of Ordinance 9849 raises issues of serious public importance regarding the purposes of the GMA and the implementation of that act by local government. Under the circumstances of this case, however, we do not reach these unquestionably important issues.

■ The Washington Administrative Procedure Act, RCW 34.05, provides that on judicial review of administrative action, "[i]ssues not raised before the agency may not be raised on appeal . . ..". RCW 34.05.554. *See also Griffin v. Department of Social & Health Servs.*, 91 Wn.2d 616, 631, 590 P.2d 816 (1979); *Kitsap Cy. v. Department of Natural Resources*, 99 Wn.2d 386, 393, 662 P.2d 381 (1983).[12] This rule is more than simply a technical rule of appellate procedure; instead, it serves an important policy purpose in protecting the integrity of administrative decisionmaking. As

---

[12] Issues not before the administrative agency may be raised on appeal to superior court where statute provides for de novo review of the agency action. *Kitsap Cy.*, 99 Wn.2d at 392. This is not such a case. *See* RCW 36.93.160(5).

the District of Columbia Circuit has recognized, rules like RCW 34.05.554 further the purposes of:

> (1) discouraging the frequent and deliberate flouting of administrative processes; (2) protecting agency autonomy by allowing an agency the first opportunity to apply its expertise, exercise its discretion, and correct its errors; (3) aiding judicial review by promoting the development of facts during the administrative proceeding; and (4) promoting judicial economy by reducing duplication, and perhaps even obviating judicial involvement.

*Fertilizer Inst. v. United States Envtl. Protec. Agency*, 935 F.2d 1303, 1312-13 (D.C. Cir. 1991) (quoting *Cutler v. Hayes*, 818 F.2d 879, 890-91 (D.C. Cir. 1987)). We also note that reversal of an agency on grounds not raised before the agency could have a seriously demoralizing effect on administrative conduct. Knowing that even decisions made with the utmost care might be reversed on heretofore undisclosed grounds, administrative agencies could become careless in their decision-making. Enforcing RCW 34.05.554 thus serves important policy goals associated with the integrity of the administrative process.

Here, we decline to consider the effect of Ordinance 9849 because it was not raised before the Board. Our review of the record indicates the ordinance was not presented to the Board as barring the proposed annexations, nor did the Board receive testimony to that effect.

The record reveals King County never argued to the Board that the proposed annexations were prohibited by Ordinance 9849, despite numerous opportunities to do so. Several King County staff persons presented extensive testimony before the Board and never mentioned the ordinance. See testimony of Miriam Greenbaum, Manager, Planning and Community Development Division; Clerk's Papers, at 172-74; testimony of Laurie Grant, Community Planning Section; Clerk's Papers, at 174-94, 206-09, 211-21; Testimony of Rocky Piro, Project Manager, Intergovernmental Planning Project, Clerk's Papers, at 195-206, 209-11. Instead, the King County representatives only referred to existing King County *policies*

regarding municipal annexations, not to the allegedly governing ordinance. See, *e.g.*, testimony of Rocky Piro; Clerk's Papers, at 195. None of these policies purported to prohibit annexations. King County also transmitted a number of letters to the Board regarding the proposed annexations. See Clerk's Papers, at 462, 1482. None of these missives mentioned the ordinance, referring only to the King County policies discussed by Rocky Piro at the Board hearings.

■ King County asserts that, despite the striking absence of any suggestion from its representatives to the Board that Ordinance 9849 prohibited the annexations, the ordinance was in fact an issue at the Board's hearings. The County points to the presence of the ordinance in the materials before the Board and to a memorandum presented to the Board on behalf of Black Diamond arguing that the ordinance had no preclusive effect. These facts are not dispositive. In order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record. *See Durez Div. of Occidental Chem. Corp. v. OSHA*, 906 F.2d 1, 5 (D.C. Cir. 1990).

In the context of reviewing the decisions of the lower courts, this court has occasionally raised issues sua sponte, or permitted parties to raise issues which were not raised below. The court has allowed such practice when the parties have ignored a governing statute, *Maynard Inv. Co. v. Mc-Cann*, 77 Wn.2d 616, 623, 465 P.2d 657 (1970), or when constitutional rights are at issue, *State v. Hieb*, 107 Wn.2d 97, 108, 727 P.2d 239 (1986). King County analogizes this case to our decision in *Maynard*, arguing that the Board ignored a governing ordinance. We find this analogy unpersuasive. The rationale of the *Maynard* rule is that it is the duty of reviewing courts to apply the law, even where the parties have argued their case under different theories. *Maynard*, 77 Wn.2d at 623. Here, the law which we must apply is RCW 34.05.554, not Ordinance 9849.[13]

---

[13]We note that the Court of Appeals has also consistently refused to allow challenges to administrative decisions based on issues not before the agency, even

Under the circumstances of this case, therefore, we decline to consider whether Ordinance 9849, establishing interim urban growth areas, bars the annexations approved by the Board. Consequently, we also decline to consider whether the ordinance is preempted by the GMA.

## IV
## A

In addition to its challenge based on Ordinance 9849, King County also contends that the decision was unsupported by substantial evidence in the record and arbitrary and capricious. We first address King County's substantial evidence challenge.

■ Our review of this issue is narrowly structured. The Legislature has set out specific terms for judicial review of the decisions of the Board. The BRB Act provides for judicial review as follows:

> (6) The superior court may affirm the decision of the board or remand the case for further proceedings; or it may reverse the decision if any substantial rights may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> . . . .
>
> (d) Affected by other error of law, or
> (e) Unsupported by material and substantial evidence in view of the entire record as submitted, or
> (f) Arbitrary or capricious.
> An aggrieved party may seek appellate review of any final judgment of the superior court in the manner provided by law as in other civil cases.

RCW 36.93.160(6). Judicial review by the superior court is limited to the evidence which was before the board in rendering its decision. RCW 36.93.160(5). Upon appeal of a superior

---

when the new issues involved governing statutes and ordinances. *See Friends of the Law v. King Cy.*, 63 Wn. App. 650, 655 n.1, 821 P.2d 539 (1991) (rejecting challenge based on failure to comply with county ordinance), *review denied*, 119 Wn.2d 1006 (1992); *Gibson v. Auburn*, 50 Wn. App. 661, 668, 748 P.2d 673 (rejecting challenge based on state statute and city ordinance), *review denied*, 110 Wn.2d 1028 (1988); *Scarsella Bros., Inc. v. Department of Licensing*, 53 Wn. App. 882, 886 n.4, 771 P.2d 760 (rejecting challenge based on state statute), *review denied*, 113 Wn.2d 1004 (1989).

court decision reviewing a boundary review board decision, we apply the standards contained in RCW 36.93.160(6) directly to the record before the board rather than to the decision of the superior court. "An appellate court reviews administrative decisions on the record of the administrative tribunal, not of the superior court." *Sherman v. Moloney*, 106 Wn.2d 873, 881, 725 P.2d 966 (1986); *Farm Supply Distribs., Inc. v. State Utils. & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974); *Schmitt v. Cape George Sewer Dist. 1*, 61 Wn. App. 1, 4, 809 P.2d 217 (1991). We therefore review the record before the Board to determine whether there was substantial evidence in the record to sustain the Board's decision.

The standards governing decisions by the boundary review boards are contained in RCW 36.93.170 and RCW 36.93.180. RCW 36.93.170 provides a list of nonexclusive "factors" which the board is required to consider in reaching a decision. In this case, the Board stated it had considered the "factors" and selected at least 10 of the factors for "particular attention". Board's Decision; Clerk's Papers, at 63-73.

█ We have not imposed strict requirements upon Board decisionmaking based on these "factors". In *King Cy. Water Dist. 54 v. King Cy. Boundary Review Bd.*, 87 Wn.2d 536, 543, 554 P.2d 1060 (1976), this court held that as long as a board stated it had considered the "factors" and singled several of them out for "particular attention", then RCW 36.93-.170 was satisfied. In this case, the Board has met these requirements.

RCW 36.93.180 states a list of "objectives" which decisions of the board "shall attempt to achieve". The statute provides:

> The decisions of the boundary review board shall attempt to achieve the following objectives:
> (1) Preservation of natural neighborhoods and communities;
> (2) Use of physical boundaries, including but not limited to bodies of water, highways, and land contours;
> (3) Creation and preservation of logical service areas;
> (4) Prevention of abnormally irregular boundaries;
> (5) Discouragement of multiple incorporations of small cities and encouragement of incorporation of cities in excess of ten thousand population in heavily populated urban areas;

(6) Dissolution of inactive special purpose districts;

(7) Adjustment of impractical boundaries;

(8) Incorporation as cities or towns or annexation to cities or towns of unincorporated areas which are urban in character; and

(9) Protection of agricultural and rural lands which are designated for long term productive agricultural and resource use by a comprehensive plan adopted by the county legislative authority.

RCW 36.93.180. Unlike the "factors" listed in RCW 36.93-.170, these "objectives" are more than simply aspirational. *Spokane Cy. Fire Protec. Dist. 9 v. Spokane Cy. Boundary Review Bd.*, 97 Wn.2d 922, 926, 652 P.2d 1356 (1982). A decision which fails to achieve the objectives of RCW 36.93-.180 is reversible. *Spokane Cy.*, 97 Wn.2d at 926; *Richland v. Franklin Cy. Boundary Review Bd.*, 100 Wn.2d 864, 870, 676 P.2d 425 (1984). On at least one previous occasion, a reviewing court has overturned boundary review board decisions based on such a failure. *See Snohomish Cy. v. Hinds*, 61 Wn. App. 371, 379, 810 P.2d 84 (1991) (trial court overturning boundary review board).

B

Before reviewing the decision of the Board, we must determine the proper analytic framework to be applied to "substantial evidence" review of the objectives in RCW 36.93.180. Black Diamond argues a reviewing court is required to affirm a board decision which furthers at least *one* of the statutory objectives. King County contends a reviewing court should engage in a comprehensive "balancing" of the various objectives to determine whether the objectives were more advanced or harmed by a boundary review board's decision.

On the whole, the statute and the case law favor King County's position. Boundary review board decisions may be reversed when "[u]nsupported by material and substantial evidence in view of the *entire record as submitted*". (Italics ours.) RCW 36.93.160(6). The statute's reference to the "entire record" supports the proposition that judicial review of the RCW 36.93.180 objectives is to involve examination of each of the objectives. It would be anomalous to

interpret this provision as requiring a reviewing court to uphold a board decision based on the furtherance of only one objective when the remainder of the record manifestly displayed the hindrance of the other eight.

The "one objective" approach proposed by appellants could also work to subvert the purposes of judicial review of boundary review board decisions. Under appellants' approach, boundary review boards would have little incentive to engage in complete and careful review of the evidence, since they could completely insulate their decisions from judicial review by considering only one of the RCW 36.93.180 objectives. A comprehensive approach, by way of contrast, would provide incentives for boundary review boards to consider each of the statutory objectives in detail, thus providing for better decisionmaking in the long run.

The case law construing RCW 36.93 also does not support Black Diamond's stringent "one objective" approach. In the principal case on point, *Spokane Cy.*, this court analyzed several of the statutory objectives and concluded: "We cannot say, however, that this harm is significant enough to offset the other advantages the Board concluded were present." 97 Wn.2d at 927-28. This holding indicates an application of a comprehensive approach to the effects of the Board's decision on the statutory objectives.

The majority of the other cases involving substantial evidence review of boundary review board decisions included discussion of all of the objectives which were relevant in that particular case. *See, e.g., Richland*, 100 Wn.2d at 871; *Snohomish*, 61 Wn. App. at 381-82. The lone exception, *Wenatchee v. Boundary Review Bd.*, 39 Wn. App. 249, 255, 693 P.2d 135 (1984), did not apply a "one objective" approach, but rather engaged in review so cursory as to be uninstructive.

Black Diamond cites to statements in the *Spokane* and *Richland* cases for the proposition that a boundary review board decision which fails to achieve any objectives is reversible. The principle that a board decision which furthers no objectives is reversible, however, does not imply that a decision which furthers any objectives is not reversible. At no

point did either the *Spokane* or *Richland* court (or any other court) indicate that *only* those decisions which failed to achieve any objectives are reversible.

The application of a comprehensive approach to the objectives in RCW 36.93.180 will not result in the replacement of the decision of a boundary review board with that of a reviewing court, since the standard for review is still that of substantial evidence. The question on review is not whether the objectives were advanced or hindered, but rather whether substantial evidence in the record supports a board's decision regarding the achievement of the objectives. Review for support by substantial evidence is an extremely limited form of judicial review. *Ancheta v. Daly*, 77 Wn.2d 255, 260, 461 P.2d 531 (1969).[14]

We therefore consider each of the statutory objectives to determine whether substantial evidence supports the conclusion that the objectives of RCW 36.93.180 were furthered by the Board's decision to approve the proposed annexations.

## C

■ A decision is supported by substantial evidence if "the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991) (quoting *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987)), *cert. denied*, ___ U.S. ___, 118 L. Ed. 2d 391, 112 S. Ct. 1672 (1992). *Accord, Olmstead v. Department of Health, Med. Section*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991). Applying this standard, we conclude that, while there is evidence that one of the objectives of RCW 36.93.180 would be detrimentally affected by the proposed annexations, there is sufficient evidence in

---

[14]Also, the board decision will still be accorded all of the usual forms of judicial deference to agency expertise. *See, e.g., St. Francis Extended Health Care v. Department of Social & Health Servs.*, 115 Wn.2d 690, 695, 801 P.2d 212 (1990); *Department of Ecology v. Ballard Elks Lodge 827*, 84 Wn.2d 551, 556, 527 P.2d 1121 (1974).

the record to convince a rational person that overall the objectives would be furthered.

The record reveals that two of the statutory objectives, RCW 36.93.180(3) and RCW 36.93.180(1), would be significantly furthered by the proposed annexations. There is ample evidence to support the Board's findings that the proposed annexations would further the third statutory objective, creation and preservation of logical service areas. See Board's decision; Clerk's Papers, at 1228-29. The record shows the proposed annexations are within Black Diamond's water service area, Clerk's Papers, at 154-55, 160, and fire service area, Clerk's Papers, at 157, 284-85. The record also supports the conclusion that extension of Black Diamond's sewer services would assist in the creation of a logical sewer service district. The Board received testimony that development of the area on septic tanks could endanger the Rock Creek Drainage Basin and Lake Sawyer, Clerk's Papers, at 135-36, 137-44, 148-50, and that Black Diamond had "plenty" of sewer capacity available for whatever development occurred in the annexations, Clerk's Papers, at 156. Finally, there is evidence in the record that police response time from Black Diamond would be superior to the response time presently available from King County. Clerk's Papers, at 157, 160. The Board's findings that this objective would be furthered are thus well supported in the record.

The record also supports the conclusion that the first objective, preservation of natural neighborhoods, would be furthered by the proposed annexations. In *Spokane Cy. Fire Protec. Dist. 9 v. Spokane Cy. Boundary Review Bd.*, 97 Wn.2d 922, 926, 652 P.2d 1356 (1982), we construed " 'natural neighborhoods' " to mean "either distinct geographical areas or socially and locationally distinct groups of residents." 97 Wn.2d at 927 n.2. The record supports the Board's conclusion that the areas are geographically part of the Black Diamond community. See Board's decision; Clerk's Papers, at 1227. For the most part, the annexations are contained within the Rock Creek Drainage Basin. Also, the testimony before the Board indicated that the Basin corresponds with a plateau which

gently slopes down to the north toward Lake Sawyer, and the annexations are on this plateau. Testimony of Gerald Harkleroad; Clerk's Papers, at 377. The objective would therefore be furthered by the proposed annexations.[15]

▮▮▮ The record does not support the Board's conclusions that three of the other statutory objectives, RCW 36.93-.180(2), RCW 36.93.180(4), and RCW 36.93.180(8), would be furthered by the proposed annexations. First, there is no evidence to support the Board's conclusion that the second statutory objective, use of physical boundaries, would be furthered by the proposed annexations. See Board's decision; Clerk's Papers, at 1228. In *Spokane*, we held that "[l]egal boundaries are not . . . 'physical . . .'" for purposes of this objective. 97 Wn.2d at 927 n.1. *See also Snohomish Cy. v. Hinds*, 61 Wn. App. 371, 381, 810 P.2d 84 (1991) ("As legal boundaries, lot lines are excluded from the definition of 'physical boundaries'"). As is clear from the record, the proposed annexations in this case are based *entirely* upon legal boundaries created by lot lines. The proposed annexations therefore would not further the second statutory objective.

Second, there is also no evidence in the record to support the Board's conclusion that the proposed annexations would support the fourth statutory objective, prevention of abnormally irregular boundaries. The City's boundaries as they presently stand are reasonably compact, and any irregularity which exists would not be remedied by the addition of the proposed annexations.

▮▮▮ The Board found the proposed annexations furthered this objective because the annexation boundaries followed existing boundary and lot lines. See Board's decision; Clerk's

---

[15]There is no evidence in the record, however, to support the Board's finding that the areas are *socially* within Black Diamond's natural community. See Board's decision; Clerk's Papers, at 1227. The present population of the 783 acres involved is only 10 persons. Clerk's Papers, at 64. There is thus no socially or locationally distinct group of residents at all, much less one naturally associated with Black Diamond. The Board's decision rests on the belief that future residents will feel an association with Black Diamond. The purpose of the first statutory objective is "preservation", however, not "creation" of communities and we reject the Board's finding in this respect.

Papers, at 1229. The focus of this objective, however, is not on whether the annexation boundaries are straight or crooked, but rather whether a proposed annexation causes or prevents unnatural projections or odd, impractical shapes. *See, e.g., Snohomish Cy. v. Hinds*, 61 Wn. App. 371, 810 P.2d 84 (1991) (Board decision rejecting a proposed annexation which would have added an odd "inverted T" to the south end of Everett). We also note that construing this objective to favor the use of straight boundary lines would subvert the application of the second objective, which mandates the use of physical boundaries. The mere fact that the annexation boundaries are straight therefore does not support the Board's finding that the proposed annexations prevent "irregular boundaries".[16]

Lastly, the record does not support the Board's finding that the proposed annexations would further the eighth statutory objective, annexation of urban areas, since there is no evidence that the proposed annexations "are urban in character". As noted above, the present population of the annexation properties is 10 persons. Further, there are no business establishments in the area other than timber operations and no roadways which would suggest an urban character.

The sole reason the Board found this objective furthered was its conclusion that "[t]he proposed annexation site is in the process of transition from rural to urban use." See Board's decision; Clerk's Papers, at 1229. However, the notion that boundary review boards may rely on future urbanization was specifically rejected in *Spokane*. There, we held:

> The Board also concluded that [*sic*] area to be annexed would soon become urban in character; however, we attach little weight to this finding. The urban character focused upon by RCW 36.93-

---

[16]King County argues this objective would be "set back" by proposed annexations. This argument is not persuasive. While the proposed annexations will not correct any impractical boundaries, they do not rise to the level of "abnormally irregular". The boundaries which would result from the proposed annexations are not equivalent to the "inverted T" at issue in *Snohomish* or the "island" annexation proposed in *Richland*. Instead, this annexation falls within the rubric of the decision in *Spokane*, where "[t]he boundaries of the proposed annexation, while somewhat irregular, [were] not abnormally so." 97 Wn.2d at 927.

.180(8) above is *present* urban character. Future urbanization is of little relevance . . ..

97 Wn.2d at 927. The holding in *Spokane Cy. Fire Protec. Dist. 9 v. Spokane Cy. Boundary Review Bd.*, 97 Wn.2d 922, 652 P.2d 1356 (1982) is consistent with the language of the objective, which addresses areas which "are" urban in character, not those which are "becoming" urban in character. RCW 36.93.180(8). Under *Spokane*, the Board's reliance on the transitional status of the proposed annexations was incorrect. The Board's findings that the second, fourth, and eighth statutory objectives would be furthered are thus not supported by the record.

Against the positive impact of the proposed annexations on the first and third statutory objectives must be weighed the negative impact which the annexations would have on the last statutory objective, protection of lands designated as agricultural and rural. The record reveals that at the time of the Board's decision, the proposed annexations were then designated as rural by the King County Comprehensive Plan and for forestry use by the area plan developed under the county comprehensive plan, the Tahoma/Raven Heights Communities Plan. See Board's decision; Clerk's Papers, at 1220; see also testimony of Miriam Greenbaum; Clerk's Papers, at 173-74. The areas in question were therefore "rural lands" which had been "designated for long term productive agricultural and resource use" by a "comprehensive plan".

Appellants correctly point out that in determining the significance of the harm to this objective, however, the actual usefulness of the land for long-term agricultural and resource use is relevant. In *Spokane*, we held that a proposed annexation of rural land did not seriously impede this objective where the land in question may have been of "marginal agricultural value". 97 Wn.2d at 927. There is substantial evidence in the record that the land involved here is unsuitable for long-term forestry use. See, *e.g.*, testimony of Michael Stevens, land use planning manager for Plum Creek; Clerk's Papers, at 253-54; testimony of Lyn Keenan, Black Diamond

planning consultant; Clerk's Papers, at 404. Given the evidence on this score, this objective is not significantly harmed by the proposed annexations.

To summarize, two of the applicable statutory objectives would be significantly furthered, three would neither be furthered nor hindered, and one would be somewhat set back by the proposed annexations. While substantial evidence review of boundary review board decisions is not merely an exercise in counting objectives, our review of the record and the statutory objectives convinces us there is sufficient evidence to convince a fair-minded person that overall the objectives of RCW 36.93.180 would be furthered rather than hindered by approval of the proposed annexations. The decision of the Board was therefore supported by substantial evidence.

## V

King County also challenges the Board's decision to approve the proposed annexations as "arbitrary or capricious" under RCW 36.93.160(6)(f). King County chiefly relies upon the Board's alleged failure to consider the effect of the GMA and the urban growth planning process in making its decision.

▮ The test for determining whether agency action is arbitrary or capricious is well established in Washington. This court recently stated that arbitrary or capricious action is:

> "[W]illful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous."

*Kendall v. Douglas, Grant, Lincoln & Okanogan Cys. Pub. Hosp. Dist. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991) (quoting *Abbenhaus v. Yakima*, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978)). *Accord, Schrempp v. Munro*, 116 Wn.2d 929, 938, 809 P.2d 1381 (1991).

The basis for King County's argument is its claim that the Board's decision to approve these annexations subverted the

urban growth area designation process under the GMA. As described in more detail above, the GMA mandates that urban growth areas will be designated by the counties in consultation with the municipalities. Former RCW 36.70A-.110. Once these areas are designated, annexations like the one in this case will be prohibited. *See* RCW 35A.14.005. If the annexations are accomplished prior to the designation of the urban growth areas, then by law they will become part of the Black Diamond urban growth area. Former RCW 36.70A.110(1).

King County is understandably concerned that these annexations will essentially allow Black Diamond to "bootstrap" this land up from a rural designation into an urban growth area. Nothing in the GMA at the time of the Board's decision, however, explicitly required a moratorium on annexation activity in the period prior to the designation of the urban growth areas. At the time of the Board's decision, the only relevant alteration made by the GMA to the BRB Act was to be found in RCW 36.93.230, which was part of the 1991 amendments. *See* Laws of 1991, 1st Sp. Sess., ch. 32, § 22.[17] This provision allows counties to disband their boundary review boards *after* the completion of the plans required by the GMA, including the designation of urban growth areas. Thus, the GMA explicitly contemplated the continued activity of the boards prior to the designation of the urban growth areas. This explicit provision indicates that the GMA was not intended to replace the BRB Act pending the designation of the urban growth areas.

Several of the "factors" which the Board is required to consider under RCW 36.93.170 include legislative enactments like the GMA within their scope. *See, e.g.*, RCW 36.93.170(1)

---

[17]RCW 36.93.157 was later added as part of the 1992 amendments. Laws of 1992, ch. 162, § 2. This provision mandates that Board decisions must be "consistent with" the purposes of the GMA. Since this provision was not enacted until after the Board reached its decision, it was not arbitrary or capricious for the Board not to have considered it.

("comprehensive plans and zoning"); RCW 36.93.170(2) ("effect of ordinances, governmental codes, regulations and resolutions on existing uses"). These factors indicate the Board should have considered the effect of the GMA in making its decision to approve the annexations. The Superior Court concluded that it was "willful and unreasoning" of the Board not to do so. Superior court decision; Clerk's Papers, at 1583.

Although the Board's decision does not itself discuss the GMA, the Board did consider the possible effect of the GMA. It heard testimony regarding the work program the county had put in place regarding the designation of the urban growth areas. Clerk's Papers, at 195-200. At least one Board member expressed the conclusion that the GMA would not affect the Board's decision prior to the designation of the urban growth areas. Comments of member Morrill; Clerk's Papers, at 204-05. While perhaps the Board should have devoted more discussion to the impact of the proposed annexations on the planning process under the GMA, this flaw in the Board's decisionmaking does not rise to the level of action taken "willfully and in disregard of facts and circumstances".

Given the presence of explicit reference in the GMA to the continued operation of the boundary review boards, and the Board's consideration of the GMA, we cannot say the Board's action was arbitrary or capricious.

## VI

In conclusion, Black Diamond's DNS is reversed as "clearly erroneous". The proposed annexations are hereby enjoined until Black Diamond, in its capacity as lead agency, prepares an adequate EIS. Since the Board's decision to approve the annexations was based on the City's DNS, it is also necessary for us to reverse that decision. Because we have determined that the Board's decision was supported by substantial evidence in the record and was not arbitrary or capricious, however, it will not be necessary for the Board to repeat its review procedures in full. Instead, it will be sufficient for the Board

to reopen its hearings for consideration of the EIS prepared by Black Diamond in accord with its usual procedures. After due consideration of the EIS prepared by the City, the Board may then reverse its previous decision, or affirm that decision with modifications to its existing decision.

BRACHTENBACH, SMITH, GUY, and JOHNSON, JJ., concur.

DURHAM, J. (concurring in part, dissenting in part) — I agree with the majority opinion in all respects, save one: the remand for an environmental impact statement (EIS). This requirement is not only contrary to our well-established statutory and case law, it is also unsupported by the record. The current case involves nothing more than a proposal to change boundary lines between King County and Black Diamond. There were no land use proposals, no development plans, and no environmental changes before the board when it approved the annexation. Although such proposals may occur in the future, at which time an EIS is both necessary and appropriate, the majority is jumping the gun by requiring one at this early date. Ironically, there is significant testimony on the record that virtually the same development proposals will be made in the future regardless of which government body regulates the area. Thus, I dissent to the EIS requirement.

This case arises out of the City of Black Diamond's attempt to annex 783 acres located adjacent to city boundaries. In accordance with the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, Black Diamond considered the potential environmental impacts of the proposed annexation. Following this "threshold determination", it issued a "determination of nonsignificance" (DNS). Here, the completed annexation itself would not have any environmentally adverse impacts. There was also testimony that development was equally likely should the annexed area remain under King County jurisdiction. Although some property owners in

the area indicated a desire to eventually develop their lands, the annexation plan was not accompanied by any permit applications, or requests for plat approval. Nor would the annexation automatically result in running power lines, building roads, or laying sewer lines. In short, the Black Diamond annexation would do little more than change a few lines on a map.

Generally, a DNS is appropriate when the environmental impacts of a proposed action are "merely speculative". WAC 197-11-060; *see also* WAC 197-11-340; WAC 197-11-330.[18] SEPA requires the preparation of an EIS only for "legislation and other major actions having a *probable significant, adverse environmental impact*". (Italics mine.) RCW 43.21C-.031; *accord* RCW 43.21C.030(2)(c). The term probable is defined as:

> likely or reasonably likely to occur, as in 'a reasonable probability of more than a moderate effect on the quality of the environment' (see WAC 197-11-794). *Probable is used to distinguish likely impacts from those that merely have a possibility of occurring, but are remote or speculative.*

(Italics mine.) WAC 197-11-782. The record before us clearly fails to meet these requirements.

Nonetheless, the majority rejects the statutory language and announces a new SEPA standard: "We therefore hold that a proposed land use related action is not insulated from full environmental review simply because there are no existing specific proposals to develop the land in question or because there are no immediate land use changes which will flow from the proposed action." Majority, at 664. The rationale for this new rule is that "[d]ecisionmaking based on complete disclosure would be thwarted if full environmental review could be evaded *simply because no land use changes would occur* as a direct result of a proposed government action." (Italics mine.) Majority, at 664. Although I share the majority's concern with full disclosure, the virtually bound-

---

[18]Under RCW 43.21C.095, regulations enacted pursuant to SEPA are to be accorded "substantial deference".

less language it chooses in this statement is supported by neither common sense nor precedent. "Possible" environmental impacts are not the same as "probable" ones.

None of the three cases cited by the majority supports its new SEPA interpretation. In the first case, *Bellevue v. King Cy. Boundary Review Bd.*, 90 Wn.2d 856, 586 P.2d 470 (1978), this court did not "require[] an environmental assessment for proposed annexations to cities". Majority, at 663. Rather, we held that the record was unclear as to whether a *threshold determination* had been made, *Bellevue*, at 867, and expressly withheld an "opinion as to whether an assessment of environmental factors . . . must result in a decision to prepare a full EIS", *Bellevue*, at 868.

Likewise, the Court of Appeals decision in *Juanita Bay Vly. Comm'ty Ass'n v. Kirkland*, 9 Wn. App. 59, 510 P.2d 1140, *review denied*, 83 Wn.2d 1002 (1973) offers no support for the majority position. That opinion did not involve a speculative project, but the actual grading and excavation of a 55-acre tract of property in preparation for an industrial park. The final case cited by the majority, *Murden Cove Preserv. Ass'n v. Kitsap Cy.*, 41 Wn. App. 515, 704 P.2d 1242 (1985), is actually contrary authority. In *Murden Cove*, the Court of Appeals upheld a DNS, stating that "in the absence of *specific* plans for any future development, SEPA does not require consideration of 'every remote and speculative consequence of an action.' " (Italics mine.) 41 Wn. App. at 526-27 (quoting *Short v. Clallam Cy.*, 22 Wn. App. 825, 834, 593 P.2d 821 (1979)).

Even less persuasive is the majority's policy rationale. It seeks to justify its new SEPA rule by claiming that it is necessary to prevent "snowballing"; *i.e.*, land use projects that "acquire virtually unstoppable administrative inertia". Majority, at 664. If indeed there is a serious "snowballing" problem — a fact not revealed in this record — the majority's solution is akin to swatting a fly with a SCUD. Next, the majority claims that its new rule is warranted because Black Diamond based its annexation decision on "environ-

mental considerations". There is a difference, however, between decisions that consider environmental factors and decisions that have environmental impacts; SEPA is only concerned with the latter.

Contrary to the majority's claims, we have consistently emphasized that environmental impact statements will not be required where the government action is associated with only a *speculative* land use project. For example, in *Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 552 P.2d 184 (1976), plaintiffs challenged the City's compliance with SEPA, claiming that the City's road construction plans would cause it to later approve a developer's proposals for a particular piece of adjacent property. We denied the SEPA claim because the completion of the road was "in no way dependent upon or intertwined with the development of the property". *Cheney*, at 343. SEPA does not require an EIS when "[t]he future use of the private parcel is too remote and speculative to call for present evaluation of its future development." *Cheney*, 87 Wn.2d at 346. As we noted, "it is impractical if not impossible to identify and evaluate every remote and speculative consequence of an action". *Cheney*, at 344. "If and when a proposed project is brought to the City for the private parcel, it can then deal with environmental considerations." *Cheney*, at 346.

Similarly, in *Lassila v. Wenatchee*, 89 Wn.2d 804, 576 P.2d 54 (1978), this court was presented with a challenge to Wenatchee's failure to commission a separate EIS for each of the various stages in redeveloping its central business district. After initially observing that not "every action or every governmental recommendation requires preparation of an EIS", *Lassila*, at 813, we held that neither the creation of a fund, the selection of a site, the acquisition of a site, the commission of design contracts, the surplusing of a site, nor the resale of a site to a third party required the preparation of an EIS. *Lassila*, at 814-15. We also upheld the City's DNS in rezoning a site in the redevelopment project because it resulted in a "down zone" — an action which reduced the number of available uses for the area. *Lassila*, at 817-18. A

proposed theater complex for the area did not affect the DNS because no building permit application or specific plans for development accompanied the down zone. SEPA did not require an EIS because the theater was "at best tentative". *Lassila*, at 818.

In *Carpenter v. Island Cy.*, 89 Wn.2d 881, 577 P.2d 575 (1978), the annexation of territory by a sewer district was challenged for failure to conduct an EIS. We held that an EIS was unnecessary because "at the time of the annexation . . . there was before the commissioners no plan for the furnishing of sewage facilities to this annexed territory." *Carpenter*, 89 Wn.2d at 883. "Where, as here, no proposal for a change in the environment is before the agency, there is no impact which can be evaluated." *Carpenter*, at 884. As this court concluded, "the annexation itself merely changed the boundaries of the district . . . [and] had no impact on the physical environment." *Carpenter*, at 883. *See also Richland v. Franklin Cy. Boundary Review Bd.*, 100 Wn.2d 864, 868, 676 P.2d 425 (1984) (SEPA does not require consideration of every remote and speculative consequence of an action).

In accord with SEPA, the above cases reflect a clear rule that preparation of an EIS is not necessary when the potential impacts of a government action are associated with land use projects that *might* take place at some time in the indefinite future. Instead, the proper time for evaluating a proposal is when the principal characteristics are readily identifiable. It is impossible to accurately analyze environmental impacts without knowing the exact nature of the project, its environmental benefits and attendant mitigating factors. Here, the majority can point only to alleged "proposals" and "possible" development "alternatives" which indicate a future intent to develop the annexed properties. See majority, at 661-67. If, in fact, the property owners in the annexed area eventually commit to developing their land, an EIS may be appropriate when they apply for a building permit or plat approval. Until then, environmental review is premature.

688

Finally, the majority implicitly claims the environmental high ground as justification for its SEPA interpretation. In fact, the opposite is true. By requiring an EIS at virtually every level, the process is degraded. A premature EIS, based upon incomplete or projected data, could well be more harmful than helpful. Instead of enhancing the governmental function, the action of preparing an EIS becomes repetitive and onerous. With no current project proposals before the board or other probable environmental impacts, the issuance of a DNS for the annexation decision was entirely appropriate. Therefore, I dissent as to this portion of the majority opinion.

ANDERSEN, C.J., and MADSEN, J., concur with DURHAM, J.

Reconsideration denied February 18, 1994.