# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

WAYNE GODING,

    Respondent/Cross-Appellant,

v.

CIVIL SERVICE COMMISSION OF
KING COUNTY;

    Respondent,

KING COUNTY, a municipal
corporation; KING COUNTY
SHERIFF'S OFFICE, a department
of King County,

    Appellants/Cross-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 72890-3-I

ORDER GRANTING MOTION
TO PUBLISH OPINION

The appellant/cross-respondent King County having filed a motion to

publish opinion, and the hearing panel having reconsidered its prior

determination and finding that the opinion will be of precedential value; now,

therefore, it is hereby:

ORDERED that the unpublished opinion filed December 14, 2015, shall be

published and printed in the Washington Appellate Reports.

Done this 12th day of January, 2016.

FOR THE COURT:

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

WAYNE GODING, )
                                )
      Respondent/Cross-Appellant, )
                                )
              v.               )
                                )
CIVIL SERVICE COMMISSION OF )
KING COUNTY; )
                                )
      Respondent, )
                                )
KING COUNTY, a municipal )
corporation; KING COUNTY )
SHERIFF'S OFFICE, a department )
of King County, )
                                )
      Appellants/Cross-Respondents. )
                                )

DIVISION ONE

No. 72890-3-I

PUBLISHED OPINION

FILED: December 14, 2015

DWYER, J. — Under applicable civil service law, when the county sheriff imposes a severe sanction—such as suspension without pay—upon a commissioned deputy the disciplinary decision must be made "in good faith for cause."[1] In such a circumstance, the disciplined employee may request that the local civil service commission review the disciplinary decision in order to ensure that the sheriff's action complied with the legal standard. If the civil service commission upholds the sheriff's action, the disciplined employee may seek judicial review of the commission's decision. This review, however, is extremely limited. The court may not disturb the decision of the commission unless that

---

[1] RCW 41.14.120.

decision was made arbitrarily or capriciously.[2] And where the commission's decision is "made with due consideration of the evidence presented at the hearing," its decision is not, as a matter of law, arbitrary or capricious.[3]

In this case, as a sanction for work-related misconduct, the King County Sheriff imposed a one-day suspension without pay, coupled with a reassignment to a less desirable detail, upon Deputy Wayne Goding. After a hearing, the civil service commission upheld the sheriff's action. Goding sought review in the superior court, which reversed the commission's decision. Given that the record makes clear that the commission duly considered the evidence presented at the hearing before it, the commission did not act arbitrarily or capriciously in upholding the sheriff's action. Accordingly, we reverse the decision of the superior court and reinstate the decision of the civil service commission.

I

Goding was employed as a shuttle deputy in the warrants unit of the sheriff's office. As a shuttle deputy, Goding, together with his colleague Deputy Bruce Matthews, was responsible for transporting inmates. This sometimes involved shuttling inmates to and from the jail and a hospital.

On March 27, 2012, Sheriff's Sergeant Michael Porter sent an e-mail to several employees, including Goding, discussing "some 'friction' recently between the jail staff and our staff who work the transport shuttle." In the e-mail, Porter instructed Goding and the other employees that,

---

[2] Greig v. Metzler, 33 Wn. App. 223, 226, 653 P.2d 1346 (1982).
[3] State ex rel. Perry v. City of Seattle, 69 Wn.2d 816, 821, 420 P.2d 704 (1966).

I expect any of our people working on the shuttle run to above all **be courteous and professional in all contacts with jail staff.** Anything less than a professional attitude and courtesy will not be tolerated regardless of the perceived "provocation."

**Follow the jail staff directions** unless they make a request that is unsafe or illegal.

. . . .

Rather than getting into a conflict with jail staff about what you feel is "not your job", just do what they ask, and bring it to my attention later if you feel they are asking you to do something that is not appropriate for whatever reason. I will be meeting with the ITR [Intake, Transfer, and Release] sergeant at the jail weekly to work out any issues that may come up regarding roles and responsibilities. We will also expect the same level of professional courtesy on the part of the jail staff, and I expect to be notified promptly if there are issues regarding their conduct.

At the civil service commission hearing, Sheriff's Captain Joseph Hodgson recalled that in March 2012, Porter came to his office to notify him that "[t]here was some friction between Sheriff's Office personnel and jail staff that needed some attention."

Over time, Hodgson noticed that Goding and Matthews "seemed to be the focus of the complaints" from the jail. In fact, during the summer of 2012, Hodgson received two separate complaints—one involving Matthews and the other involving Goding—from employees of the King County Department of Adult and Juvenile Detention alleging that Goding and Matthews failed to properly comply with requests to complete inmate booking paperwork.[4] The complaint

---

[4] The first complaint, received from Jail Captain Jerry Hardy on July 17, 2012, alleged that Matthews defied a request to properly fill out inmate booking paperwork. The second complaint, which was communicated to Hodgson in an e-mail that he received from Porter on

- 3 -

against Goding alleged that he was "argumentative and unprofessional" when interacting with a jail employee.[5]

In response to these complaints, Jail Captain Jerry Hardy spoke with Hodgson regarding Hardy's intention to restrict Goding's and Matthews' "freedom to roam" the jail. Hodgson recalled that Hardy "just felt that they were so disruptive and they were so hostile toward jail staff, that they—his assessment was that they couldn't be trusted to roam around and work with jail staff in random places."

On August 8, 2012, Hodgson "wrote out an e-mail providing my expectation as to how [Matthews and Goding] conduct themselves and the directions that they would take when they were at the jail." In the e-mail, Hodgson specifically instructed Matthews and Goding that,

> I have been informed of conflict that exists between the two of you and staff at the RJC [Regional Justice Center] Jail. This conflict goes back to some point prior to my arrival in CID [Criminal Investigation Division]. According to what I have been told, the issues revolve around your perceived resistance to compliance with jail policies and requests. I talked to Sergeant Porter shortly after my arrival in CID and at my direction, he explained to each of you that the jail facility is the domain of the jail staff and that **we do not make the rules there and we do not dictate or dispute policy there.** If you are asked to complete a task or observe a procedure in order to complete processing of prisoners, the expectation is that you will complete that task, as requested, without criticism or resistance. If you have concerns regarding the necessity, propriety, or practicality of that task or request, you are expected to bring the

---

August 8, 2012, alleged that Goding had defied a request to properly fill out inmate booking paperwork.

[5] At the hearing, in response to a question asking if anyone, other than Matthews or Goding, had trouble with the policies regarding inmate booking paperwork, Hodgson testified that, "several detectives told me they didn't understand why Matthews and Goding were having so much trouble, that they'd never had issues."

issue to the attention of Sergeant Porter. He and I will address the concerns with RJC Jail Command. These issues will not be worked out by you with jail staff at ITR. If you have concerns that are of an emergent, safety nature and cannot wait, you are expected to notify Sergeant Porter or me immediately, so some type of resolution can be reached immediately.

. . . .

[T]he expectation set forth by Sergeant Porter and being reiterated by me at this time is that you do not express your side of these arguments to jail staff. The reality is that by not pursuing concerning issues via proper channels, you are weakening your position.[6]

That same day, Porter sent an e-mail to Goding and Matthews stating that Captain Hardy "has asked me to pass on his decision that both of you be restricted to areas of the jail which are necessary for your transport functions."

On August 14—in a meeting attended by Goding, Matthews, Porter, Hodgson, and Sheriff Sergeant Bob Lurey—Goding and Matthews detailed their version of events and voiced their concerns.[7] Hodgson "reaffirmed the same

---

[6] In response to a question asking Hodgson what his intent was in sending the e-mail, he testified,

[t]o put some sort of an end to any inappropriate behavior that was being engaged in, and to provide some guidance to the detectives as to how to handle conflicts or disagreements at the RJC.

In response to a question asking what kind of conduct he was worried about at the jail, Hodgson further testified,

[e]ssentially, anything unprofessional. Certainly argumentative conduct, resistance to policy, resistance to reasonable requests, resistance to -- or failure to understand that the jail has different expectations and different policies than we do, and that it is their facility and they do set the rules there.

[7] Hodgson testified that the concerns expressed by Goding and Matthews were that,

[b]oth detectives felt like, to a great extent, the jail staff did not like them or, for lack of a better term -- and I don't want to say this is what they said, but I can't think of a better way to describe it -- but that the jail staff had it in for them, and

expectations that I established in the e-mail, that they would comply with jail requests unless it was a dire situation of officer safety or emergent in some way that was going to place somebody in jeopardy or place somebody's career in jeopardy, at which time they were notified that they should immediately contact Sergeant Porter or myself to get resolution."

In December 2012, following an internal investigation, Sheriff Captain Scott Somers, an Internal Investigation Unit Commander, issued Goding a written reprimand for his failure to properly complete required inmate booking paperwork.[8]

On February 20, 2013, near the end of Goding's shift, Goding and Matthews were instructed by Sheriff's Sergeant Christopher Myers to transport a suspect with a felony warrant from Enumclaw to the Regional Justice Center jail in Kent.

When Goding and Matthews arrived in Enumclaw to pick up the suspect, Harlan Phipps, Phipps was not restrained. Goding put restraints on Phipps and

---

the jail staff was intentionally making things more difficult for them for some reason and constantly changing rules and changing expectations

[8] The written reprimand was served on Goding by Hodgson in a meeting on December 5, 2012 that was attended by Matthews, Goding, Hodgson and Myers. Hodgson testified about the substance of the conversation during that meeting:

> There was conversation regarding, again, the fact that the jail staff was continually shifting the rules on them and making their lives difficult.
> And then we ended up talking some more about expectations and basically focused, to a great extent in the end, on improving relationships, and the fact that the ball was very much in their court and they had the ability and the opportunity, should they choose to, to improve the relationships down there.
> That was my belief at the time.

Later, Hodgson testified that the advice he gave Matthews and Goding during the December 5 meeting concerning interactions with the jail staff "was [for] them to perform the duties expected at the highest level."

placed him in the Sheriff's van.[9] At the civil service commission hearing, Myers recalled that, prior to Matthews' and Goding's departure with Phipps, Myers "anticipated that we were going to have difficulties booking Mr. Phipps, and I told them that if we had difficulties booking Mr. Phipps to please give me a call because I wanted to talk to the medical staff and find a way we can somehow get him booked into jail."

Once at the jail, the staff removed Phipps' restraints and two nurses examined him. Jail Officer Michael Ley, Goding, and Matthews were nearby as Phipps was being examined. Following the examination, the nurses informed Matthews and Goding that, for medical reasons, they were declining to admit Phipps into the jail.[10] One of the nurses observed "a lot of eye rolling by Detective Goding when he received the news [that] Phipps was declined."

Matthews telephoned Myers to inform him of the nurses' refusal to admit Phipps. Matthews gave the telephone to one of the nurses who spoke with Myers. Myers then spoke again with Matthews. Myers instructed Matthews to "take Mr. Phipps to Valley Medical Center and release custody of him there." Matthews relayed this instruction to Goding.

As Ley assisted in gathering Phipps' belongings, he noticed that Phipps was not restrained. Ley requested that Goding handcuff Phipps prior to escorting

---

[9] The restraints had two separate components: a waist chain and a set of handcuffs.
[10] Ley testified that it is "not usually a happy situation" when the jail declines to admit a prisoner "because [the officers are] going to probably have to transport this person an additional place and watch over them, make sure that they're seen. And they're going to – it's going to cause them extra time and delay in the booking process."

him through the jail. Goding refused to comply with Ley's request, asserting that it would be illegal for him to handcuff Phipps.

Ley then approached Jail Sergeant David Richardson and asked him to reiterate to Goding the jail's policy regarding restraining inmates. At the civil service commission hearing, Richardson recalled that, "I went over and, you know, first told [Goding] that, yes, that is policy, that yes, he does need to restrain the individual going back out the door. And [Goding's] comment was he's not going to do it unless his sergeant tells him to."[11] Richardson testified that Goding's tone of voice was "[j]ust kind of matter of fact. Just like his mind had been made up."[12]

Richardson then asked if Myers was at work. Matthews, who was still speaking with Myers, passed the telephone to Richardson. Richardson spoke with Myers, who agreed that Phipps should be restrained. Richardson then "indicated to Deputy Goding that Sergeant Myers agreed with me" by using a thumbs-up signal. Richardson recalled that when he relayed Myers' agreement to Goding, "Deputy Goding took my word for it" that Phipps needed to be

---

[11] In response to a question asking how he interpreted Goding's statement, Richardson testified:

Well, I was standing there in uniform, obviously I was a sergeant. So I took that as being a jail sergeant wasn't good enough, and that [Goding] wanted to hear it from a -- either -- you know, his sergeant.

[12] In response to a question asking what impression Goding's actions and words left Richardson with that day, he stated,

the general impression was that he thought he's a Sheriff's deputy and we're jailers, and he can do what he wants and that he doesn't have to abide by our rules, that he's just above us. That was the general impression that I got.

restrained.[13]  Goding did not seek to speak with Myers regarding the legality of handcuffing Phipps.[14]

Richardson then observed Goding handcuff Phipps and "put waist restraints back on [Phipps], but he did so in a – I'd call it very unsecure manner. It was, like, a defiant kind of, 'Okay. Well, if I have to do it I'll do it, but I'm just doing it for show.'" It appeared to Richardson that "the chain was so loose . . . . the back was hanging down around [Phipps'] knees."[15]

Goding and Matthews then escorted Phipps out of the jail and transported him to the hospital.

The next day, Myers met separately with several people regarding the incident, including Goding, Richardson, and Porter.  Myers first met with Goding. When Myers asked Goding what he would have done had Myers not been available by telephone, Goding told him that "I would have done it."[16]  Myers

---

[13] In response to a question asking Richardson if there was any hesitation or delay by Goding between the time that he received a thumbs-up and the time that Goding put the restraints on Phipps, Richardson testified, "I don't think there was.  I think he – again, he took my word that his sergeant had agreed with me, and he did it."
Goding testified that after receiving the thumbs up from Richardson, "I immediately started handcuffing [Phipps]."

[14] Goding testified at the hearing that, "I seem to remember wanting to talk to Sergeant Myers, and Sergeant Richardson got on the phone and gave me the thumbs up."
Goding's testimony contradicted a statement that he made during an earlier internal investigation interview concerning the incident.  Therein, Goding stated that he did not want to speak to Myers regarding his concern about the legality of handcuffing Phipps.

[15] In response to a question asking if Hodgson knew how much time had elapsed between Goding being initially asked to restrain Phipps and ultimately doing so, Hodgson testified: "No, but I – my generally [sic] understanding, it wasn't more than a few minutes."
Goding testified that the time elapsed was "I think two, three minutes.  Definitely less than five.  Two to three minutes."

[16] At the civil service hearing, Goding testified that his response to Myers' question was "Well, I guess I would have handcuffed him because otherwise I would have been stuck at that door for — you know, until the next day because they weren't going to pop the door open."

clarified to Goding "that his prisoner still has a warrant for his arrest and is in his custody until he is released, in this case at Valley Medical Center."

Next, Myers spoke with Richardson.

Richardson told me about the incident and said this was similar to previous incidents with Detective Goding. Sgt. Richardson told me that after hearing [that] I said to restrain his prisoner, Detective Goding placed the waist chains on so loose they were hanging around the prisoner's legs.

Myers then spoke with Porter.

Porter told me that both he and Captain Hodgson had both given Detective Goding an email in which these expectations were laid out. Sgt. Porter told me that Detective Goding was told to follow all jail policies and jail staff instructions and if there was an issue he was to carry out the task and then later report it to his chain of command.

In March 2013, Myers filed a complaint against Goding with the Internal Investigations Unit of the Sheriff's Office. The complaint alleged that Goding exhibited "insubordination or failure to follow orders," in connection with the incident on February 20. Specifically, the complaint alleged that Goding "refused to restrain a prisoner at the direction of King County Jail staff and [a] sergeant prior to movement, thus failing to obey a direct written order as written in an email to [Goding] from CAPTAIN Joseph Hodgson, dated August 8, 2012."

The internal investigation followed. During the course of the investigation, several individuals were interviewed, including the two jail nurses who examined Phipps, Cathy Woodruff and Rosemarie Tibayan-Hickey.

Woodruff recalled that "[Matthews and Goding] were upset that they were not able to book [Phipps] and they asked me several times why I couldn't book

- 10 -

him and I said I couldn't release a lot of details, because of HIPPA, but that he needed [to be] seen by a doctor beforehand." When questioned further, Woodruff noted that Goding exhibited "some eye rolling and just, you know kind of terse statements, 'Well, I'm going to have to talk to my Sergeant and you'll have to explain it to my Sergeant.'"

Tibayan-Hickey recalled that Goding was "irritated" by the decision of the nurses not to admit Phipps. In addition, she stated that Goding was "[p]ersistent in us changing our . . . decision on deferring him."

At the conclusion of the internal investigation, Sheriff's Captain D.J. Nesel, an Internal Investigation Unit Commander, sent a memorandum to Sheriff's Major Ted Stensland notifying Stensland that "[t]he Internal Investigations Unit has completed their investigation . . . . The case file is being sent to you for review. Please consider your findings and recommendations."

In response, Stensland wrote a "Findings and Recommendations" memorandum regarding the allegation that Goding's conduct on February 20 was an act of "insubordination or failure to follow orders." Therein, Stensland expressed his findings, after reviewing the internal investigation case file and discussing the incident with the Internal Investigation Unit Advisory Committee:

> I find that Det. Goding knowingly disregarded previous clear supervisory direction regarding following DAJD [Department of Adult and Juvenile Detention] directives, later admitted that he would have eventually followed the directive had he not forced the issue to be decided by his supervisor, and then applied the restraints improperly effectively disregarding the intent of the policy that prisoners be secured when being escorted out of the facility. Therefore I recommend this allegation be **SUSTAINED**.

- 11 -

This is the second sustained incident of insubordination involving and affecting the working relationship with DAJD Staff, and a mutually cooperative atmosphere is critical in this job. I recommend that Detective Goding be **suspended for one day without pay**, and that he be **immediately transferred** out of the Criminal Warrants Unit.

Subsequently, Nesel issued a "Loudermill[17] Notification" memorandum wherein he communicated Stensland's finding and disciplinary recommendation to Goding. In addition, Nesel informed Goding that he was "entitled to a Loudermill hearing with Sheriff [John] Urquhart to respond to this recommendation and provide any information you would like him to consider before making a final decision in this matter."

Goding requested a hearing before the Sheriff.

On September 30, 2013, following the hearing, Sheriff Urquhart issued a "Loudermill Hearing Results" memorandum. Therein, Urquhart communicated his conclusion to Goding.

On August 8, 2012 you were told in an e-mail from Captain Hodgson that, "If you are asked to complete a task or observe a procedure in order to complete the processing of prisoners, the expectation is that you will complete that task, as requested, without criticism or resistance."

Furthermore, in a meeting on August 14, 2012 attended by your then-sergeant and your Guild representative Mr. Lurry, [sic] you were told to follow the direction of jail staff "unless the direction was a direct violation of our policies or was an officer safety issue." This was not the case in this incident and you did not follow the direction of jail staff until told to do so by your sergeant.

ALLEGATION:    Rules of Conduct – Insubordination or Failure to Follow Orders GOM 3.00.015(2)(a)

---

[17] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

After careful consideration I concur with the findings of Major Stensland, that this allegation should be sustained.

**Discipline:** One (1) day suspension without pay for violations associated with [the February 20 incident] to be imposed and served by December 31, 2013.

Immediate transfer from the Criminal Warrants Unit to unincorporated patrol.

On October 1, Urquhart issued a personnel order to Goding wherein he stated,

Deputy Wayne Goding, assigned to the King County Sheriff's Office, Patrol Operations, Precinct 3, has been found in violation of General Orders Manual Section 3.00.015(2)(a) – RULES OF CONDUCT: MISCONDUCT: Insubordination or failure to follow orders.

Therefore, under authority of R.C.W. 41.14.110 and 41.14.120, Deputy Wayne Goding, is suspended without pay for one (1) day (8 hours). This discipline will not be imposed until after **October 16th, 2013,** to give Deputy Wayne Goding, the opportunity to exercise any appeal rights he may have under the collective bargaining agreement in effect between King County and the King County Police Officer's Guild, or the King County Civil Service Rules.

On October 18, Goding provided a written request of appeal to the King County Civil Service Commission. A three-day hearing was held during which the commission heard from seven witnesses and reviewed an array of documentary evidence.[18]

Goding testified that he believed the situation involving Phipps was unique, stating that, "[t]his situation had never, in 11 years, popped up." Goding estimated that in those 11 years he had "personally handled, you know, 4,000 to

---

[18] The hearing was held on January 30, 31, and February 5, 2014. Live testimony from Hodgson, Myers, Ley, Tibayan-Hickey, Richardson, Urquhart, and Goding was presented.

6,000" prisoners. Goding elaborated that "[t]his is the first time I was inside the jail and the sergeant said, '[t]urn him loose, don't – you're not going to wait on him, you're not going to rebook him.'"[19] Goding also testified to his belief that,

> [t]here's only two reasons to put someone in handcuffs: one, they're under arrest; or two, a safety reason, either you think they're going to assault you or someone else or hurt themselves. So you might put them in – they call it "officer safety" – is a common term for it, but for safety reasons put them in handcuffs, or they're under arrest. That's the only two reasons that I know you can handcuff somebody. And if you handcuff somebody, you'd better be able to explain why you're putting them in handcuffs.

In light of this belief, Goding told the commission, he did not think he had a lawful reason to handcuff Phipps.

In addition, Goding testified regarding the manner in which he applied the restraints to Phipps. He denied that he put the chains on in a loose manner as a sign of disrespect. Instead, Goding testified that,

> when I put the chains around [Phipps], as a compassion for his pain, I put them on -- and I wouldn't even say loose. I put them on to fit his body. I didn't snug them up, which I almost never do unless someone is uncooperative, but I put them on to fit his body, and I put the padlock on and put the handcuffs on him. And because of the coveralls and his large stomach and his swollen left side, the chains slid down to right below his butt. But that was not the intention to put them on that way. That's just what happened, when he moved they slid down.

Further, Goding testified that he "put [the chains] on the same way" when he applied the restraints to Phipps at the jail as he had done when he first restrained

---

[19] Myers told Matthews to "kick [Phipps]." Goding testified that after he received this instruction from Matthews he

> believed that we were going to release [Phipps]. So, that means he's released. And the only thing we had to arrest him on was a warrant, and the sergeant declined to book him on the warrant, so now he has nothing to be under arrest.

No. 72890-3-I/15

Phipps in Enumclaw. Goding recalled that once he was outside of the jail with Phipps, he "took the chains off [Phipps], put him in the van unrestrained, and drove him to the hospital."

Richardson's and Myers' testimony rebutted Goding's characterization of the situation as unique and confirmed the need to restrain Phipps. Richardson testified that "[i]n my 24 years, no law enforcement officer has taken issue with restraining an arrestee going back out, for whatever reason it is." Richardson elaborated on the need to restrain prisoners in the sally port area,

> [w]hile that technically is a secured area of the jail, it's unsecured in the aspect that police officers step out of their cars and put their weapons in the trunks of their cars. So they're unholstered, have their guns in their hands. And that would be -- there would be the main reason that we insist inmates going back out the door are restrained. Because once they get past that [ ] door, you know, theoretically, if an officer is standing behind his trunk, which could be just steps away out that door, putting his weapon into his trunk, not secured, an inmate could run out and grab it.

Consistent with Richardson's views, Myers testified regarding the practice of restraining prisoners stating, "[i]t would be whenever we're transporting anybody in our custody that's a prisoner, that that person would be restrained." In response to a question asking Myers if this policy or practice is communicated to new officers when they join the criminal warrants unit, Myers testified, "[i]t's a department policy. So it's actually written into our general orders manual that we're all responsible for knowing."

Tibayan-Hickey testified that Goding was not "happy about us declining" to admit Phipps and that a "disagreement" ensued. When asked if Goding pressed the point with her, she testified,

- 15 -

[w]ell, he said there was something about the charges for the inmate were serious and that we should accept him. But, you know, we said we would accept him, but we needed to get him medically cleared first before we took him into the jail.

When asked whether she felt comfortable during the interaction with Goding, Tibayan-Hickey answered that,

[i]t was unusual from the fact . . . that they were having the argument. Most of the time we would just, okay, give them the paperwork, they'd take the paperwork, take the inmate to the hospital. But it was a lot of back and forth on why we weren't and why we should kind of a thing.

When asked whether one deputy was more involved in the argument than the other, Tibayan-Hickey responded, "I think it was more Goding because Matthews was on the phone with I think his supervisor."

Sheriff Urquhart testified that, in preparing for a Loudermill hearing, he

review[s] the case file, I look at the statements, I read the statements, I read the Findings and Recommendations, I look at the proposed discipline, I look at the comparable disciplines.

And then before the meeting I confer with the internal investigations captain, the specific detective that -- detective-sergeant in internal investigations that did the investigation, and I speak with the HR manager, and I speak with our labor attorney. And just kind of review the case and look at the discipline, those sorts of things.

The Sheriff also reviewed the investigation itself.

I looked at [the investigation] to make sure it was complete and thorough, to make sure there was just cause, that no stone had been left unturned. I always give the person that's coming in for the grievance or the Loudermill, as well as their representative, an opportunity to suggest or to ask for further investigation. That was not done. I didn't see anything else that needed to be done. It was completed within the contractual 180 days. I had no issues with the investigation per se at all.

In reviewing the substance of the claims against Goding, the Sheriff noticed that

> I recall that it was essentially the same sort of conduct [as a prior incident of discipline]. A little bit different, but basically getting into an argument with the jail staff over a prisoner.

> By this point in time, if I'm remembering correctly, the admonition had gone from Deputy Goding's -- originally from Detective Goding's sergeant at the earlier investigation now up to his captain, who had sent him an e-mail saying, "This type of conduct is unacceptable. You will do what the jail tells you to do unless it's unsafe or illegal."

In reaching his conclusion, the Sheriff considered a written statement provided by Goding wherein Goding maintained his assertion that Officer Ley's request to restrain Phipps was illegal. As the Sheriff recalled,

> [Goding] had been told by his sergeant that if the jail did not accept this prisoner, he was to take him up to Harborview[20] and then leave Harborview, unarrest him. And his argument was that when he was told in the jail booking area that they would not accept the prisoner, that at that point in time the suspect was not under arrest and, therefore, it would have been illegal for him to handcuff him as was requested by the jail.

> And I told [Goding] at the time [during the Loudermill hearing], and I feel to this day, that was an illogical and wrong analysis of the law. [Phipps] was still under arrest and still would be under arrest until they got to Harborview and they walked away from him. The warrant was still in existence, it had not been cleared, it had not been quashed, and he had every right under the law to put him back in handcuffs.

The Sheriff also found it significant that Goding did not speak directly with Myers about his concern regarding the illegality of restraining Phipps. In light of

---

[20] The Sheriff misremembered the hospital to which Goding had been directed by his sergeant. This variance is of no significance.

Goding's failure to speak directly with Myers, the Sheriff asserted his belief to the

commission that,

> I think if [Goding had] been as concerned as he told me in the
> Loudermill that this was an illegal act, I think he would have made
> his concerns much more - would have voiced his concerns more to
> his sergeant than he did. He had an opportunity to get on the
> phone with Sergeant Myers; he didn't. If this was such a big
> Constitutional issue, as you have said and he has said, then I think
> he would have presented his case more.

> I think the fact that he didn't, that he allowed the jail sergeant
> to get on the phone and talk to the sergeant, leads me even more
> to believe that this was an excuse not to handcuff the prisoner.

Based on his review of the internal investigation file, the Sheriff

determined that Goding "was argumentative" with the jail staff. In addition, the

Sheriff believed that the restraints appeared

> [h]aphazard so that the belly chains were drooping down to the
> suspect's knees, and not how we would expect to fully restrain a
> prisoner. Again, in a[n] in-your-face type of action to the jail staff,
> as it was portrayed in the internal investigations -- investigation.

The Sheriff further testified about the conclusions that he reached after

conducting the Loudermill hearing, stating that there are

> [t]wo things I look at in a Loudermill. The first was should this case
> be sustained or not. And of course I can overturn the discipline, I
> can ask for more investigation. So that's my first decision point.
> And I believed that the allegation should be sustained.

> And I look at the discipline. And I look at the discipline
> obviously from [a] progressive standpoint, but primarily I look at the
> discipline to try to determine what is going to change behavior.
> That is my goal, is to change behavior. And clearly the first case
> that I reviewed regarding Deputy Goding did not change his
> behavior. He's still having a problem in the jail.

> So I agreed with the recommended discipline that a one-day
> suspension was appropriate and transfer out of the unit was

appropriate. I didn't see any other way we could change his behavior, which was unacceptable to me and unacceptable for anybody working in the Sheriff's Office.

In response to two questions asking Urquhart if he considered comparable discipline within the department and past history—which included the prior written reprimand that Goding had received—before imposing discipline for the February 20 incident, the Sheriff responded "I did" to both questions.

At the conclusion of the civil service hearing, the commission determined that Goding's failure to comply with Ley's directive was an act of insubordination, and that "the County met its burden to establish that the discipline imposed was made in good faith for cause." It upheld the Sheriff's action.

Goding appealed the commission's decision to the King County Superior Court. The superior court reversed, ruling that the commission's decision was "arbitrary and capricious." The superior court ordered that Goding be reinstated to his position in the criminal warrants unit and be awarded "full back pay."

The Sheriff now appeals.

II

The Sheriff contends that "[t]he Superior Court erred in entering two orders ruling that the Civil Service Commission acted arbitrarily and capriciously in finding that the King County Sheriff's discipline of Deputy Wayne Goding was in good faith for cause under RCW 41.14.120." Br. of Appellant/Cross Resp't at 3. This is so, the Sheriff asserts, because "the Commission's decision was based on competent evidence and was not arbitrary and capricious." Br. of Appellant/Cross Resp't at 16. We agree.

- 19 -

Chapter 41.14 RCW governs "Civil Service for Sheriff's Office." "The general purpose of this chapter is to establish a merit system of employment for county deputy sheriffs and other employees of the office of county sheriff, thereby raising the standards and efficiency of such offices and law enforcement in general." RCW 41.14.010.

The commission is a statutory body "created in each county and in each combination of counties . . . to carry out the provisions of this chapter." RCW 41.14.030. Its members are appointed by officials outside of the police force in order to ensure independence. RCW 41.14.030. The commission is authorized "[t]o hear and determine appeals or complaints respecting the allocation of positions, the rejection of an examinee, and such other matters as may be referred to the commission." RCW 41.14.060(5).

Our authority to review commission decisions is set forth in RCW 41.14.120. "The judiciary's role in reviewing action taken by the [Civil Service] Commission is severely limited." Greig v. Metzler, 33 Wn. App. 223, 226, 653 P.2d 1346 (1982). Indeed, "[w]here a tribunal has been established to hold inquiries and make decisions . . . review by the judiciary is limited to determining whether an opportunity was given to be heard and whether competent evidence supported the charge." State ex rel. Perry v. City of Seattle, 69 Wn.2d 816, 821, 420 P.2d 704 (1966). Specifically, RCW 41.14.120 confines judicial review "to the determination of whether the order of removal, suspension, demotion, or discharge made by the commission, was or was not made in good faith for cause, and no appeal shall be taken except upon such ground or grounds."

- 20 -

When making this determination, we review the commission's record, not the record or decision of the superior court. Greig, 33 Wn. App. at 226.

RCW 41.14.120 explicitly controls decisions regarding "removal, suspension, demotion, or discharge" and sets forth the applicable standard of review. Under RCW 41.14.120, we do not separately review findings of fact or conclusions of law. Instead, we review the commission's decision as a whole to determine whether the decision demonstrates that the commission duly considered the evidence presented at the hearing. Perry, 69 Wn.2d at 821.

> The crucial question is whether or not there is evidence to support the commission's conclusion. A finding or a conclusion made without evidence to support it, is, of course, arbitrary. State ex rel. Tidewater-Shaver Barge Lines v. Kuykendall, 42 Wn.2d 885, 891, 259 P.2d 838 (1953); but it is not arbitrary or capricious if made with due consideration of the evidence presented at the hearing. See Miller v. Tacoma, 61 Wn.2d 374, 390, 378 P.2d 464 (1963).

Perry, 69 Wn.2d at 821.

We "must exercise independent judgment to determine whether the Commission acted arbitrarily, capriciously, or contrary to law." Greig, 33 Wn. App. at 226 (citing Benavides v. Civil Serv. Comm'n, 26 Wn. App. 531, 613 P.2d 807 (1980); Eiden v. Snohomish County Civil Serv. Comm'n, 13 Wn. App. 32, 533 P.2d 426 (1975)). But "[a] decision by an administrative commission is not arbitrary and capricious simply because a trial court and this court conclude, after reading the record, that they would have decided otherwise had they been the administrative commission." Perry, 69 Wn.2d at 821. Indeed, the commission's decision is not arbitrary or capricious if the commission duly considered the evidence presented at the hearing. Perry, 69 Wn.2d at 821. Reviewing courts

are prohibited from "substitut[ing] [their] judgment for the independent judgment of the civil service commission." Perry, 69 Wn.2d at 821.

The question before the Commission was whether the discipline imposed on Goding *by the Sheriff* was made in good faith, for cause.

On appeal, the question before us is whether *the Commission's decision*—wherein it concluded that the discipline imposed by the Sheriff was, indeed, made in good faith, for cause—was arbitrary or capricious. This decision must be upheld "if made with due consideration of the evidence presented at the hearing." Perry, 69 Wn.2d at 821. The record indicates that the commission gave the evidence due consideration and that its decision was made in light of the evidence before it.

Goding asserted at the time of the incident, and reiterated in the civil service hearing, that he was excepted from following Ley's directive because the request to restrain Phipps was illegal. In reaching its decision, the commission analyzed Goding's position at length:

> The County rejected Goding's position, effectively finding that [the illegality] enumerated exception to the orders did not apply. Implicit in the County's finding, and made explicit by Sheriff Urquhart's testimony, is that Goding did not reasonably believe the exception applied.
>
> The precise question before the Commission is whether the County had good cause to reject Goding's position.
>
> The question is a close one, primarily because the handcuff incident was not overtly argumentative or confrontational, and lasted just a few minutes. The Commission also took into consideration that the jail staff did not initiate a complaint about the handcuffing incident; instead Sgt. Myers was the person who initiated the complaint and investigation.

However, after careful consideration, the Commission finds that the County had good cause to reject Goding's proffered explanation and determine that he was insubordinate. The overall record does not support that Goding reasonably believed that the "illegal" exception applied. The most relevant points are below.

First, even though the circumstances described by Goding as so unique as to not have occurred in 11 years, they were in fact very similar to numerous other occasions where prisoners were escorted back and forth between the jail and the hospital. No other witness testimony or other evidence—outside of Goding's own statement—pointed to any previous instance of a prisoner being transported in and out of the sally port area of the jail unrestrained.

Second, Goding did not appear to account for or consider the second justification for handcuffing that he said his training supplied: officer safety. Testimony and evidence established the obvious point that transfer through secure areas of a jail facility where armed law enforcement officers are securing their weapons and other prisoners are present could present a safety risk. Officer Ley said that he was surprised and puzzled by Goding's position. Richardson testified that in 24 years working at the jail, the need to restrain unreleased prisoners in this area had never been questioned. Sgt. Myers testified that this type of incident had never happened before, and that prisoners are always restrained in and out of the sally port. Goding did not produce any evidence or testimony to counter the well-established practice or to dispute the safety aspect of restraining prisoners in the secure area of the jail.

Third, Goding's efforts to address the concern while at the jail were inconsistent with a belief that it would have been illegal to re-handcuff Phipps. Goding gave his explanation to Officer Ley. The record, while less than clear on this point, indicates that he did not articulate his position directly to Sergeant Richardson, but rather relied on the fact that Officer Ley had related it to him.

The record is clear, however, that Goding did not speak to his own sergeant directly about his concern about whether it was lawful to re-handcuff Phipps. Goding knew that Officer Matthews was talking to Sgt. Myers on the phone. Goding had the opportunity to tell Matthews and/or Richardson that he needed to talk to Myers. But despite his claim that this incident was so unique that it had not occurred in 11 years of transporting thousands of prisoners, and despite his claim that it was so concerning to him that he initially

refused to comply with a clear instruction from DAJD Staff, Goding did not avail himself of the opportunity to talk to Myers directly.

The Commission is sympathetic to Goding's argument that he was in a bit of a Catch-22, in that he had been admonished numerous times to follow jail staff direction without challenge or resistance, but had also been instructed to raise possibly illegal directions to his supervisor. We do find the fact that the incident was a low-level, professional exchange, lasting only a few minutes, relevant in this regard.

However, considered together, it was reasonable for the County to conclude that if Goding maintained a reasonable conviction that it would have violated Phipps' constitutional rights to be re-restrained, that he would have asserted it more forcefully and directly than he did.

There are other facts and circumstances that support this conclusion. The record establishes that Phipps was rejected for booking at the end of Goding's shift. Officer Ley and Jail Health staff Nurse Hickey stated also that Goding was not happy about the medical deferral, and was irritated. Jail Health staff Nurse Woodruff also stated in her IIU interview that Goding was upset. These observations tend to undercut Goding's position that the only motivation behind his initial refusal to handcuff Phipps was a concern about the legality of the action.

In addition, the available information surrounding the manner in which Goding re-applied the belly chain and handcuffs on Phipps also casts doubt on the sincerity of his position.

As set forth in the Summary of Facts, there is some dispute as to whether Goding cuffed Phipps differently the first time than the second. Sgt. Myers was present at the first application, and recalled that Phipps was cuffed properly at that time.

Goding stated that he applied them the same way both times, and that he absolutely did not re-apply the belly chains intentionally loosely. Rather, he explained he put them on to fit Phipps['] body and because of his large belly and medical condition the chains slid down. He agreed that the belly chain was applied loosely with the back part hanging to Phipps' knees.

Sgt. Richardson also observed that the belly chain was applied loosely and, in his view, improperly. As described above, he

- 24 -

believed that Goding re-applied the chain intentionally loosely, in an expression of defiance.

Sheriff Urquhart credited Sgt. Richardson's account of the handcuffing, and concluded that Goding's method of placing the chains on Phipps was an "in your face type of action" and an act of defiance.

It is difficult to discern with any certainty another person's intent. Nonetheless, given (1) the established history of a problematic relationship between Goding and jail staff; (2) the unusual dispute over a routine matter such as handcuffing a [prisoner] transport out of the jail; (3) the agreement that the chains were very loosely applied; and (4) Richardson's observation and contemporaneous interpretation of Goding's intent, the County acted reasonably in considering this incident as an additional reason to reject Goding's defense to the allegation of insubordination.

The Commission therefore upholds the County's finding that Goding was insubordinate.

*Was the discipline for good cause?*

Goding raised an issue about the scope of the hearing in that the order issued imposing discipline in this matter does not identify that it is based on progressive discipline, and does not cite or refer to the previous discipline. . . .

He is correct. The September 30, 2013 memo [Loudermill Hearing Results Memorandum] from Sheriff Urquhart to Goding does not mention the prior discipline or refer to progressive discipline, nor does the Personnel Order 2013-228 of October 1, 2013, which imposes the current discipline.

However, Urquhart's Loudermill findings letter does contain the following sentence: "After careful consideration I concur with the findings of Major Stensland, that this allegation should be sustained."

CID Commander Major Stensland's 7-24-13 Findings and Recommendations [Memorandum], forwarded to IIU Commander Captain Nesel, states: "This is the *second sustained incident of insubordination* involving and affecting the working relationship with the DAJD Staff, and a mutually cooperative atmosphere is critical in this job. I recommend that Detective Goding be suspend[ed] for

one day without pay and that he be immediately transferred out of the Criminal Warrants Unit."

Sheriff Urquhart also stated during his oral testimony that while he considered the handcuffing incident as a significant stand-alone issue, he considered the two prior guidance and expectation memos and the prior written reprimand in determining discipline. He said that he looked at discipline as both progressive and to change behavior, and concluded that the previous memos and discipline had not changed Goding's behavior.

While it would have been advisable for the County to have articulated in the Loudermill memo and the Personnel Order that progressive discipline was a basis for the decision, the Commission finds that there is an adequate basis to conclude that the disciplinary decision was progressive, and built upon previous warnings and actual discipline of Goding.

. . . .

Therefore, the Commission's decision is that the discipline imposed was for good cause.

. . . .

**Finding**

Based on the foregoing, the Commission denies Goding's appeal, and finds that the County met its burden to establish that the discipline imposed was made in good faith for cause.

Because the record indicates that the commission duly considered all of the evidence that was presented at the hearing, fully explained the bases for its determinations, and based its determinations on its consideration of the evidence, the superior court erred by concluding that the commission acted in an arbitrary and capricious manner in determining that the discipline was imposed in good faith, for cause.

- 26 -

II

In a cross appeal, Goding contends that the hearing before the commission was untimely and that, as a result, he is entitled to be treated as the prevailing party. We disagree.

A

At the beginning of the civil service hearing, a commissioner stated, "I'd like just to confirm for the record that the parties have stipulated that the appeal of this matter was timely and in accordance with the rules."[21] Neither party objected.

"It is the duty of counsel for all parties to promptly call the court's attention to any error in the [proceeding]. Counsel may not secretly nurture an error, speculate upon a favorable verdict, and then, in the event it is adverse, bring forth the error as a life preserver . . . ." on appeal. Agranoff v. Morton, 54 Wn.2d 341, 346, 340 P.2d 811 (1959).

The same principle applies to litigation of this sort. Goding in no way raised an issue of timeliness to the commission, even though invited by the commission to do so. He now attempts to engage in word play, contending that the commission only asked about the timeliness of the filing of his appeal, not the hearing itself. If he harbored a complaint about timeliness, his duty of candor to

---

[21] In his brief, Goding cites to this statement, asserting that "[t]he question posed to counsel for Mr. Goding, and to which he assented, was whether he agreed that the appeal itself was timely, not whether the hearing was being conducted on a timely basis." Reply Br. of Resp't/Cross-Appellant at 2.

An examination of the record indicates that the commission posed no such question to Goding's counsel.

the tribunal required him to clarify the issue with the commission at that time. By not doing so, he forfeited any claim of error based on the timeliness of the proceeding.

## B

In addition to forfeiting his claim of error, Goding also waived his claim by not asserting it before the commission.

Goding was obligated to raise his claim of timeliness prior to the commencement of the hearing.

> "Our cases require issues to be first raised at the administrative level." Citizens for Mount Vernon v. City of Mount Vernon, 133 Wn.2d 861, 869, 947 P.2d 1208 (1997). Furthermore, "[i]n order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record." King County v. Wash. State Boundary Review Bd., 122 Wn.2d 648, 670, 860 P.2d 1024 (1993).
>
> . . . .
>
> Requiring resolution of an issue at the administrative level is more than "'simply a technical rule of appellate procedure; instead, it serves an important policy purpose in protecting the integrity of administrative decision making.'" Pac. Land Partners, LLC, v. Dep't of Ecology, 150 Wn. App. 740, 754, 208 P.3d 586 (2009) (quoting King County, 122 Wn.2d at 688).

ABC Holdings, Inc. v. Kittitas County, 187 Wn. App. 275, 282-83, 348 P.3d 1222 (2015), review denied, No. 91878-3, ___ P.3d ___ (Wash. Nov. 4, 2015).

As our Supreme Court has held in the past: "Plaintiff, with full knowledge of the alleged irregularity, failed to object at any point in the administrative process. The right to raise the question before the superior court has been

No. 72890-3-I/29

waived." Hill v. Dep't of Labor & Indus., 90 Wn.2d 276, 280, 580 P.2d 636 (1978) (challenge to decision-maker waived); see e.g., Escamilla v. Tri-City Metro Drug Task Force, 100 Wn. App. 742, 750-51, 999 P.2d 625 (2000) (challenge to timeliness waived), abrogated on other grounds by In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 215 P.3d 166 (2009).

Goding did not raise his assertion of untimeliness to the commission. As a result, on this question, no evidence was taken, no facts were contested, no factual findings were made, and no ruling was made. In essence, Goding asks us to reverse a decision that the commission was never called upon to make. We will not do so.[22]

The decision of the superior court is reversed. The decision of the King County Civil Service Commission is reinstated.

We concur:

---

[22] Because Goding is not the prevailing party on appeal, we need not address the remaining issues set forth in his cross appeal.

- 29 -